INMATES OF OCCOQUAN, et al., Plaintiffs,

v.

Marion BARRY, Mayor, et al., Defendants.

Civ. A. No. 86–2128.

United States District Court, District of Columbia.

Dec. 22, 1986.

Alvin J. Bronstein, Edward I. Koren, Alexa P. Freeman, Steven Ney, National Prison Project of the American Civil Liberties Union, Washington, D.C., for plaintiffs.

Metcalfe C. King, Asst. Corp. Counsel, Washington, D.C., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

This action is brought by a class of inmates confined at the Occoquan I, II, and III Facilities of the Lorton Correctional Complex. The Court, on August 13, 1986, certified the class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure as "all persons, present and future, confined to the Occoquan Facilities located on the Lorton reservation operated by the District of Columbia Department of Corrections."

Plaintiffs have filed this action under 42 U.S.C. § 1983, seeking declaratory and injunctive relief for deprivation under color of state law of rights secured by the Fifth and Eighth Amendments to the United States Constitution. Plaintiffs contend that an excessive inmate population; deficiencies in environmental health and safety; food services, fire safety, medical and dental services, and mental health care, alone or in combination, violate their rights guaranteed by the United States Constitution.

A trial to the Court was followed by extensive post-trial briefing. Plaintiffs presented testimony by five expert and three inmate witnesses. Defendants offered the testimony of five experts and three lay witnesses. Based upon the Court's findings of fact and conclusions of law, judgment is awarded in plaintiffs' favor.

## I. *Findings of Fact*

The Occoquan Facilities have a total of 19 housing units. Occoquan I and II each have seven housing units, while Occoquan III has five housing units. These living quarters, constructed in 1925, are brick buildings with wooden roofs. Transcript ("Tr.") at 1105. The buildings, or dormitories, for the most part are single-story buildings. Each housing unit features a day room in the front, a separation with toilet, shower, and laundry areas, and large squad bay dormitories. The buildings are identified by letter, number, or both. Dormitories J and K are two-story buildings, and Dormitory 5 is in the basement of the gymnasium. Tr. at 30.

Other facilities include the gymnasium, culinary unit, a small chapel, an outdoor recreation field, and administration and program offices. The Occoquan Facilities, which are classified as medium security institutions, are, of course, ringed with security fencing.

The population trend at Occoquan indicates that the population has been increasing steadily for the past year, except for the emergency transfer of hundreds of inmates following the riot on July 10, 1986, and the transfer in October 1986, of 200 inmates to the new Modular Facility at the Lorton Complex. Tr. at 741; Plaintiffs' Exhibits 8, 9. On October 21, 1985, the population of the three Occoquan Facilities was 1,397. One year later, October 27, 1986, the population had risen to 1,600, so that it was not far below the level of 1,756 that existed at the time of the July 1986 riot. Tr. at 88. On November 24, 1986, the population at the three Occoquan Facilities had crept up to 1,637. *See* Daily Population Reports filed with United States District Court for the District of Columbia in *Campbell v. McGruder*, No. 1462–71 (D.D. C.).

### A. *Environmental Conditions*

#### 1. *Housing*

Both parties' public health experts concurred that the revised American Public Health Association ("APHA") standard, which allots 95 square feet per inmate, is acceptable as a minimum standard in dormitory situations. Tr. at 473–74, 1270–72. The 95 square-foot figure includes a prescribed 60 square feet per inmate of living space and 35 square feet per inmate for day room space. The APHA standards were written by environmental health and safety professionals and are supported by epidemiological evidence. Tr. at 1213, 1274; *see also* Plaintiffs' Exhibit 31.

The accepted method of calculating living space is prescribed by the American Correctional Association ("ACA"). The ACA method of measurement of living space instructs that the calculation of total living

space of a housing unit excludes the day room, toilet and shower rooms, as well as traffic corridors. *See* Plaintiffs' Exhibit 30, 1983 Supplement at 2–4129.

Applying the APHA 95 square foot per inmate standard, using the ACA method of space calculation, the Occoquan Facilities do not provide adequate living space for inmates. Tr. at 476, 1271; *see* also Plaintiffs' Exhibits 48 at 40–41. In some places, beds are but seven to nine inches apart. Tr. at 476–77; *see also* Plaintiffs' Exhibit 48 at 40–43.

Confining excessive numbers of people in limited spaces significantly increases the risk of transmission of airborne diseases, such as tuberculosis. Tr. at 1273. The inadequate and sometimes nonoperational ventilation system in the Occoquan dormitories greatly exacerbates this serious health risk. Tr. at 444–48, 513–14, 749, 1223–27, 1253; *see also* Plaintiffs' Exhibits 14ii; 14jj; 45 at 35; 48 at 34–35.

Plaintiffs' and defendants' medical experts also noted that inadequate medical screening of the population entering Occoquan's dormitories compounds further the risk of transmission of airborne communicable diseases. Tr. at 195–203, 1074–78; *see also infra* at 29. Inadequate ventilation aggravates this "seeding" of the population and increases the risk of the spread of airborne communicable diseases. Tr. at 195–96, 448–51.

As one might well expect, greater numbers confined in limited spaces result in greater noise levels, as well. There was uncontradicted expert testimony that excessive noise levels were prevalent in the living and day room areas of the dormitories. Tr. at 456, 1124–26; *see also* Plaintiffs' Exhibit 48 at 37. Plaintiffs' environmental expert, Ward Duel, found that noise levels in the dormitories often exceeded the ACA daytime standard of 70 decibels. *See* Plaintiffs' Exhibit 30 at 2–4130. In Mr. Duel's judgment the noise levels in the Occoquan dormitories approach industrial standards used by the Occupational Safety and Health Administration. Tr. at 457; *see also* Tr. at 36, 113; Plaintiffs' Exhibits 6 at

4; 50 at 17–18. Existing authorities indicate that sustained excessive noise levels increase stress levels and pose a significant risk to inmates' physical and mental health. Tr. at 458; Plaintiffs' Exhibit 31 at 83.

Expert testimony revealed that the lighting is inadequate throughout the dormitories. Defendants' expert environmentalist, using the APHA 30–foot candle standard, found extensive deficiencies. Tr. at 1277–79; *see also* Plaintiffs' Exhibits 31 at 71–72; 48 at 38–39. Maintenance of adequate lighting minimizes the risk of accidents, is essential to the perforance of work tasks, reading and recreational activities. Plaintiffs' Exhibit 31 at 71.

General sanitation in the dormitories was found to be below acceptable environmental standards. Tr. at 35, 112, 1161–88, 1190–91. Occoquan dormitory windows are without screens resulting in a serious fly infestation problem, particularly in toilet and shower areas. Tr. at 463–64. This fly infestation is aggravated by a shortage of disinfectant that inmates can use to sanitize the toilet and shower areas. Tr. at 465.

Inmates sleep on mattresses that are not cleaned or sanitized between users, nor are mattress covers supplied. Tr. at 459, 1260. This poses a public health danger whereby respiratory or enteric diseases can be transmitted to inmates who are required to sleep on such soiled mattresses. Tr. at 459, 515–16, 1132. Besides soiled, dirty mattresses, torn and damaged mattresses were also found in the dormitories. Tr. at 459–60. Torn mattresses can provide a harborage for disease-carrying insects, such as mites, fleas, ticks, and lice. Tr. at 1130. There was testimony, however, indicating that the Department of Corrections is planning to procure new mattresses. Tr. at 1132; Plaintiffs' Exhibit 47.

Three dormitories merit special attention. Dormitories J–1 and J–2 were warehouses that were converted hastily to inmate housing. Tr. at 30. According to Mr. David Decatur, the Administrator of Occoquan I and II, J–1 has a maximum capacity of 70 to 75 inmates and for J–2, 55 to 60 inmates.

Tr. at 748–49. Nonetheless, J–2 has housed as many as 120 inmates. Tr. at 750. The poor ventilation in J–1 and J–2 is made all the worse by the acrid fumes of a nearby coal pile and the close quarters the inmates must share. Tr. at 40–42, 59–60, 64. Significant fly infestation was evidenced in J–2 by the pest strips that were solid black with an accumulation of flies. Tr. at 42.

Conditions in Dormitory 5 are unacceptable for housing inmates, according to Mr. Frank Phillips, the former Administrator of Occoquan III. Tr. at 46, 840. Dormitory 5, located in the basement of the gymnasium, was also converted hastily from a warehouse to a housing unit. Tr. at 30, 50. Indeed, there was but one day between the decision to open it and its occupancy. Tr. at 839. Dormitory 5 houses 80 inmates, doubled-bunked, and has no day room. Tr. at 45–56. Dormitory 5 is clearly overcrowded, cramped, and poorly ventilated. Tr. at 48, 289, 1162, 1175.

### 2. Food Service

While both parties' environmental experts noted problems in the kitchen area, such as leaky steamers (Tr. at 420–21), refrigrator doors that did not close properly (Tr. at 419–20, 1101), and missing hood filters (Plaintiffs' Exhibit 48 at 8), neither expert felt that the conditions in the kitchen posed any imminent threat of harm to the inmates. Tr. at 499–500, 1116; *but see* Tr. at 1221. The Court, however, does not share defendants' view that all is well with the Occoquan food service.

The APHA has established minimum space requirements for institutional food service facilities. Tr. at 434, 440. The APHA standards are accepted as a well-founded means for evaluating correctional facilities. Tr. at 1213–14.

The APHA standards mandate seven to nine square feet of kitchen space per inmate, including storage, receiving, dishwashing, and toilet facilities. The kitchen measures approximately 4,875 square feet. This amount of space is adequate for a maximum of 696 inmates under the APHA standard.

Further, the terms of the contract between defendants and the food service operator, Canteen Corporation, oblige the contractor to provide food for "1,400 residents three (3) meals per day" and to possess the "[c]apability to increase [such] requirements by 200 residents within 30 days notice." Plaintiffs' Exhibit 31 at 3. The contract term is from July 14, 1986, to July 13, 1987. *Id.* at 1. The daily census figures for the Occoquan Facilities from September 15, 1986, through October 1, 1986, indicate that defendants were sending more inmates to the dining room than the food service operator was obligated to serve. Plaintiffs' Exhibit 9 at 9.

The reality of inadequate kitchen space is evidenced by dry and cold food storage areas that are filled beyond capacity. Tr. at 435–37, 1219. As a result, cases of food and other materials are damaged, identifying food containers and cleaning these areas is extremely difficult, and, in the freezer units, food does not cool quickly enough to prevent the growth of bacteria. Tr. at 434–37, 1219; Plaintiffs' Exhibits 14i; 48 at 19–20.

There was also credible testimony that there existed insufficient space in the refrigerated areas to thaw frozen meat in a safe manner. Tr. at 436–37. Thawing meat is defined as a potentially hazardous product by the Food and Drug Administration because if it is not kept sufficiently cool during the thawing process, it provides a medium for the growth of illness-causing organisms. The testimony of defendants' expert environmentalist, who happens to be employed by the District of Columbia government (Tr. at 1091–92), on the issue of properly thawing meat was, at best, confusing. Tr. 1218–19. Defendants' expert equivocated as to whether the food coolers were "overcrowded," but did admit that they were filled to capacity while maintaining that there was still room to thaw properly meats in cooler no. 2. Tr. at 1219.

Last, while it appears that defendants have recently instituted an aggressive vermin control program, defendants' expert environmentalist acknowledged the existence of a prior infestation. Plaintiffs' Exhibit 58; Tr. at 1215–17. Both environmental experts testified about the presence of flies in the culinary unit. This problem was traced to missing windows and window screens. Tr. at 1257–58.

The testimony about missing window screens and broken freezer gaskets revealed the lack of any preventive maintenance and inspection program in the kitchen or in the housing units. Tr. at 469–71; 495–96, 1263. The absence of such programs has serious adverse health and safety implications that are only compounded by greater numbers of inmates using these facilities. Tr. at 1262–64.

### 3. Classification

Classification of inmates is essential for prison security. One critical function of classification is the efficient identification of violent, aggressive inmates and those in need of psychiatric care so that they can be separated from the rest of the population. See, e.g., Palmigiano v. Garrahy, 443 F.Supp. 956 (D.R.I.1977). The classification system at Occoquan appears to be dangerously overtaxed by the crush of inmates in need of classification.

Occoquan receives misdemeanants; convicted felons serving less than 10 years; convicted felons sentenced to more than 10 years who are awaiting evaluation by the reception and diagnostic center for transfer elsewhere; youths who are awaiting evaluation and study under the District of Columbia Youth Corrections Act; and youths who have been sentenced as youthful offenders who are awaiting placement at the Youth Center. In addition there are parole violators who are sent from the District of Columbia Jail ("D.C. Jail"). Tr. at 31, 741. There are 10 Classification and Parole ("C and P") officers assigned to Occoquan I and II, plus a chief C and P officer. At the time the population at the Occoquan Facilities was 1,750, these officers each had about 100 cases. Tr. at 72. Occoquan III has its own C and P staff.

Due to the increasing inmate population and the reliance upon dormitories for housing all classifications of inmates, the Occoquan Facilities have been housing maximum security inmates in open bay dormitories together with general population inmates. Many of these inmates are being held at Occoquan until space becomes available at the D.C. Jail, the Maximum Security Facility, or the Central Facility (all of which are subject to court-ordered population lids). Tr. at 37, 751; Plaintiffs' Exhibit 6 at 1. As a matter of fact, among the inmates found responsible for the July 10, 1986, riot were 60 Maximum Security inmates who were backed up at Occoquan. Tr. at 38, 126.

A properly functioning classification system is all the more essential in a medium security facility that utilizes dormitories for housing inmates. Tr. at 1194. The ACA standards discourage the use of dormitories in existing institutions, and dormitories are not permitted in new medium security institutions. Dormitory housing should be utilized, if at all, only for minimum security prisoners who have been classified for group living. Tr. at 49; Plaintiffs' Exhibit 30 at 2–4131.

### 4. Programs

Idleness among inmates results in a variety of problems, including heightened tension, frustration, and violence. Tr. at 748, 1173–74. The lack of adequate programs can also have an adverse impact on inmates' chances for parole. Tr. at 37, 39–40. There was no disagreement among the expert penologists that inmates should be engaged in some productive enterprise, properly supervised. Tr. at 93, 1171–72. Nonetheless, enforced idleness presents a major problem at Occoquan. Tr. at 37, 290, 394.

The testimony indicated that Occoquan lacks sufficient program capacity to provide meaningful program opportunities for inmates. Tr. at 82, 748. There are approximately 235 inmates enrolled in the aca-

demic program at Occoquan I and II, and 105 in the vocational program, out of some 1,200 inmates. There exist few work assignments and many inmates remain idle. Tr. at 290–91, 335, 1161, 1188. Indeed, it appears that of the jobs available, many are of a "make work" nature rather than genuine full time jobs. Tr. at 80–81. Finally, the youthful offenders housed in Dormitory "N" are not allowed to participate in any programmed activities. Tr. at 400–CC.

Both parties agreed that Occoquan needs to develop a prison industries program and provide more space for programmed activities. Tr. at 743–44, 1192. The Court, however, is distressed to learn that defendants do not know what the plans are, if any exist, for the program building now under construction in the Occoquan courtyard. Tr. at 744.

### 5. *Inmate Supervision*

Correctional officers do not supervise properly the sleeping areas of the dormitories. Correctional officers do not make patrols on a frequent and regular basis, nor are officers stationed in the rear of each dormitory so as to facilitate supervision of the living area when inmates are present. Tr. at 80, 1163, 1167–68.

Further hampering the correctional officers' ability to supervise the living areas of the dormitories, are the obstructed lines of sight existing in many of the dormitories in Occoquan I and II and in all the dormitories at Occoquan III. Tr. at 36, 1162. Double bunks, tall lockers, and the presence of inmates' clothing hanging from bunks and clotheslines combine to prevent the correctional officers from observing the activity in the dormitory. Plaintiffs' Exhibits 13(o), 13(q). Indeed, defendants' expert penologist recommended that double bunking be eliminated as it is not sound correctional practice. Tr. at 1162. The ACA standards prohibit the use of double bunks in dormitory housing. Tr. at 149; Plaintiffs' Exhibit 52 at 2–4131.

Some inmates are allowed, in some instances, to exercise control and authority over other inmates. For example, some inmates are allowed to control access by other inmates to use of the telephone. Tr. at 394. Both parties' expert penologists concurred that inmates should not be permitted to exercise authority over their fellow inmates as it can lead to bribery, sexual favors, and violence. Tr. at 96, 1204–05.

In the past year there have been at least 40 serious assaults at Occoquan I and II, including five with shanks and three with pipes. Tr. at 729; Defendants' Exhibit 60. These incidents involved serious physical injury. Tr. at 1177. Defendants' Exhibit 60, charting "assaults" from October 1985 to October 1986, does not include fights and other episodes of violence that are listed on incident reports, but not classified as "assaults." Tr. at 730. Thus, Defendants' Exhibit 60 does not include some episodes of violence that are listed in Plaintiffs' Exhibit 12, a summary of violent incidents abstracted from assault and incident reports. For example, the following incidents reported in Plaintiffs' Exhibit 12 are not included in Defendants' Exhibit 60: on January 3, 1986, an inmate was stabbed in the arm by unidentified inmates wearing ski masks; on January 5, 1986, an inmate was assaulted by several prisoners with a pipe; on March 9, and June 11, 1986, other inmates were assaulted with pipes.

The testimony of three inmate witnesses was offered. One, a 17–year-old youthful offender, recounted the repeated sexual assaults he had suffered, and another told of being bludgeoned while he slept. Tr. at 400–R–400–Z, 386–389. A third inmate testified that he was stabbed in the chest while in the bathroom in Dormitory K–1. Tr. at 558–64; Plaintiffs' Exhibit 32(d). The victim was hospitalized for three days. In each instance, the inmates reported that correctional officers were nowhere in sight.

All this leads the Court to conclude that the level of violence at Occoquan is significantly greater than defendants' statistics reflect. *Compare* Tr. at 1178–79, 1207–10. (Defendants' expert penologist's view that assault rate at Occoquan "unremarkable" not well supported.) In addition, many in-

mates are reluctant to report threats or incidents of violence for fear of being retaliated against for "snitching," or the fear that they will not be adequately protected in protective custody. Tr. at 127, 147, 400–GG.

### 6. *Segregation*

Dormitory Q ("Q block") is the only cellblock for Occoquan I and II. It contains 38 cells. Tr. at 30. Inmates of various classifications are mixed together in Q block—those on punitive and administrative segregation, inmates under protective custody, intake inmates, and inmates with mental health problems. Tr. at 77. It is not a sound correctional practice to house protective custody inmates in the same cellblock, under identical conditions and subject to the same regimen as inmates held there for disciplinary purposes. Tr. at 77, 1185.

While there have been some recent improvements made to the physical plant in Q block, inmates there are denied participation in any programs. Q block inmates, some of whom are kept there for over 30 days (Tr. at 400–AA), have no access to outdoor recreation. The exercise Q block residents receive is limited to a walk in the corridor outside their cell, for about one-half hour, three times per week. Tr. at 78–79, 397, 400–AA, 736.

Both parties' experts were in complete agreement that inmates held in protective custody and administrative segregation should be permitted daily exercise outside of Q block, as well as access to program activities. Tr. at 79, 371, 1185, 1205–06. Further, the psychologist at Occoquan noted that Q block conditions are inducing psychoses in inmates who suffered no apparent mental health problem before being placed in Q block. Tr. at 379.

### B. *Fire Safety*

#### 1. *The Expert Testimony*

Mr. Thomas Jaeger, plaintiffs' fire safety expert, is a fire safety engineer who specializes in the field of institutional occupancies, including detentional and correctional facilities. Preliminary Injunction Transcript ("PT") at 42. Mr. Jaeger is a member of the National Fire Protection Association ("NLPA"), Life Safety Code Committee, that devised the minimum requirements for detention and correctional facilities. ("Life Safety code"). PT at 43–46.

Defendants offered Mr. Paul Silver as their expert in fire safety. The Court finds Mr. Silver's testimony much less helpful than that of Mr. Jaeger. Mr. Silver admitted that he did not conduct a thorough inspection of Occoquan and that he had difficulty recalling details about his tour because he spent such a short time there. Tr. at 923, 956. He lost the notes he made of his first tour and did not take any during his second tour. Tr. at 921, 948, 951, 956. Mr. Silver did not review records (Tr. at 994), local fire codes (Tr. at 995), how exits were opened at each location (Tr. at 995), evacuation plans (Tr. at 998–99), nor training techniques for correctional officers (Tr. at 999). In contrast, Mr. Jaeger's inspection was a much more thorough and well documented one. Tr. at 579–80; Plaintiffs' Exhibit 45.

In addition, it appears that Mr. Silver neglected to verify much of what he was told about the functioning of various fire safety systems (*e.g.,* smoke detectors, fire extinguishers, emergency lights, etc.) in place at Occoquan Tr. at 937, 995–998, 1000. At the same time, Mr. Silver conceded that verifying the proper functioning of such systems is of substantial concern at Occoquan. Tr. at 1001–02; *see also* Tr. at 1302–04 (Mr. Silver recently awarded a contract in connection with the design of a new prison to be constructed by the District of Columbia).

#### 2. *The Applicable Standards*

The District of Columbia Building Code is applied to the construction of new structures and does not address specifically correctional facilities. Tr. at 630–31. The Life Safety code, on the other hand, is recognized as the only fire code that addresses specifically fire safety in correctional institutions. PT at 49–50; Tr. at 973.

This code constitutes the minimum standards for fire safety in a correctional setting. *Id.; see also* Tr. at 609 (Occoquan would not be fire safe even if all deficiencies noted by the District of Columbia Fire Marshal were corrected.) Some 20 to 25 states have adopted this code for use in their prison systems, including Maryland and Virginia. Tr. at 624.

The Life Safety code provides that new building standards apply to structures that are modified, renovated, or when occupancy is changed. Tr. at 607. The "new building" standards require a more thorough upgrading of fire safety systems. Thus, according to the Life Safety code, new building standards apply to many of the facilities at Occoquan that have had their occupancies changed. For instance, Dormitory A was formerly the visitor center for Occoquan I and II (Tr. at 603); Dormitories J–1 and J–2 were used as warehouses (PT at 53); and Dormitory 5 was the basement of the gymnasium (Tr. at 607). Dormitories F, O, and Q have undergone major renovations since being damaged by the July 1986 fire. Tr. 592, 597, 608, 678. None of these facilities satisfies existing building codes, let alone the more enlightened building standards under the Life Safety code. PT at 53; Tr. at 604, 607–08.

### 3. *Fire Alarms and Smoke Detectors*

Mr. Jaeger found the fire alarm systems in the dormitories and Q block to be deficient. Many are inoperable and none are supervised or provide automatic retransmission to the Control Centers. PT at 50, 64, 73, 76, 83; Tr. at 581–82, 593–95, 597–98, 603–05. While automatic retransmission of fire alarms to the Control Center is recommended, it is not a requirement. Noting the other deficiencies in supervision and fire safety at Occoquan, an automatic transmission system may be well advised. Tr. at 587–89, 642.

Smoke detectors are vital for early detection of a fire, particularly critical in a correctional setting where evacuation is often delayed due to competing security needs. *See* Tr. at 617–18. The smoke detectors at Occoquan are inadequate under the Life Safety code because they are not supervised and their alarms are local, ringing only at the site. Tr. at 592. In addition, many of the smoke detectors are inoperable, with some either dangling by a wire, taped over, heat damaged, or shut off. PT at 50, 64, 68–69, 73, 76, 82; Tr. at 581–82, 592, 594, 596–97, 603, 605; Plaintiffs' Exhibit 13(n). Further, it appears that the poor condition of these smoke detectors has been tolerated for a period of time. Tr. at 466, 548–49; Plaintiffs' Exhibit 48 at 46.

### 4. *Fire Extinguishers and Electrical Problems*

Typically, the facilities at Occoquan are supplied with only a pressurized water type of fire extinguisher, which would be inadequate to extinguish an electrical fire. PT at 50; Tr. at 581–82, 591, 602–03, 960. In the one dormitory that is equipped with an extinguisher for electrical fires, the date of its last inspection is 1962. Tr. at 605. In addition, many of the fire extinguishers at Occoquan are not in their proper locations, many are undocumented as to the date last serviced, and others have tags indicating that they are overdue for servicing. Plaintiffs' Exhibit 48 at 50.

A number of dangerous electrical problems exist that increase the risk of fire. Tr. at 455–56; Plaintiffs' Exhibit 48 at 47–48. In Dormitories K–1 and K–2, there are found electrical appliances, such as water coolers, with exposed wiring. Tr. at 596. A fan used in Dormitory A is particularly hazardous, as its outlet connection lacks prongs, so that bare wires must be inserted into an electrical outlet in order to turn it on. Tr. at 604. There are also places where electrical wiring is not covered properly. Tr. at 937–38. Last, none of the facilities has adequate emergency lighting. PT at 52. Though Occoquan apparently is equipped with emergency generators. Tr. at 645–46, 818.

### 5. *Evacuation Plans*

None of the facilities has adequate evacuation plans. PT at 52; Tr. at 587, 610. Satisfactory evacuation procedures are vi-

tal in a correctional setting because inmates are not capable of self-preservation in the event of a fire, *i.e.*, they rely on the correctional officers' assistance. Thus, defendants' failure to provide adequate evacuation plans and train the Occoquan staff in the relevant procedures poses a real possibility for chaos in the event of an emergency. Tr. at 615.

Specifically, the existing evacuation plans for Occoquan fail to provide sufficient direction to correctional officers as to the priorities they should attend to during an emergency. They are not instructed whether first to contact the Control Center, evacuate the inmates, or attempt to extinguish the fire. Tr. at 610. Separate plans are not provided for the different buildings. Tr. at 611–13. For example, Q block should be provided with a separate evacuation plan because it is a different kind of building from the dormitories. Tr. at 612.

The present evacuation plans also contain numerous inconsistencies. For instance, officers in the dormitories are directed to notify the Fairfax County Fire Department in case of fire, but according to officials at Occoquan, the Control Center should be notified before Fairfax County. Tr. at 611. The plans provide that proper fire extinguishers should be used for class A, B, and C fires, but the dorms are not so equipped. Tr. at 614. The plans do not call for a second officer outside Dormitories K–1 and K–2 to unlock the rear exit in order to evacuate the building. When Mr. Jaeger was on an inspection tour, he asked the officer inside Dormitory K to unlock the rear exit door. The officer discovered that the door was also locked from the outside. Tr. at 615. The officer did not discover this until she had tried five different keys before locating the key to unlock the inside door. *Id.*

There also exist several problems with exiting in case of a fire. Dormitories J–1, J–2, and 5 lack remote, or alternative exits. PT at 64, 70–71, 75–76. Dormitories K–1, K–2, 1, 2, 3, and 4 lack sufficient protection of the stairway between the two floors. Tr. 595, 605. Many exits were blocked by

furniture and standing fans (Tr. at 33, 38, 603–04), some exits lead into other buildings, not to the outside (Tr. at 603–04, 611), while other exit doors do not swing in the direction of egress (PT at 70, 73, 85; Tr. at 585).

An even more serious evacuation problem exists in Q block. To evacuate Q block requires unlocking individually 45 doors, using 6 different keys. Tr. at 732–33. While the Life Safety code requires that complete evacuation be completed in three minutes, it took eight to ten minutes to evacuate inmates from Q block during a fire on July 10, 1986. *Id.*; *see also* PT at 87. Q block is not equipped with either of the two systems that the Life Safety code calls for in cellblocks. Q block does not have remote locking doors which could be opened simultaneously in an emergency, nor a smoke partition midway in the building which could help contain a fire. Tr. at 586, 599, 947, 979. In addition, Q block lacks an adequate smoke exhaust system and no alternative system is contemplated. Tr. at 599–600, 620–21, 947, 980.

## C. *Medical Services*

Both parties' medical services experts agreed that deficiencies in the medical care delivery system at Occoquan exist which are likely to cause harm to the inmates. Tr. at 165–66, 1059, 1085. These deficiencies are systemic in nature, concerning staffing, facilities, and procedures. Tr. at 161–278, 1031–85. The experts also concurred that the APHA and the ACA standards for health care in correctional institutions represent the accepted minimums in this area. Tr. at 156, 1060; Plaintiffs' Exhibits 30, 31.

### 1. *Sick Call*

Due to the increase in population at Occoquan, formalized sick call was reduced from five days per week per dormitory to three days per week per dormitory. Plaintiffs' Exhibits 21 at 8–9. Additional access to medical care can be had only with the permission of a correctional officer. Tr. at 870, 912. According to the experts, how-

ever, Occoquan ought to conduct formalized sick call screening for each dormitory at least five times per week, anything less being insufficient. Tr. at 167, 173–75, 1065–66.

### 2. Staffing

Up until mid-October 1986, there was only one primary care, full-time physician assigned to Occoquan I, II, and III. By the time of trial, an additional physician joined the staff on a part-time basis. Tr. at 847, 913–15. Other staff available for the day shift at Occoquan includes three medical technician assistants ("MTA") and three physician assistants ("PA"). Tr. at 913–14.

MTA's have no formal medical training. Generally, they have only on-the-job training received while serving in the Armed Forces. PA's do receive some formal medical training and must work under the close supervision of a physician. MTA's are allowed to perform individual diagnoses and assessments, despite the fact that such a practice is considered improper as they lack the qualifications and training to do so. Tr. at 173–74, 912, 1066–67. In addition, only one of the PA's at Occoquan is certified by an acceptable authority, even though both experts indicated that state or national certification is recommended. Tr. at 177, 1067. There is no medical staff at Occoquan during the midnight shift. Tr. at 875, 890. Both experts indicated that for a population of 1,500, three to five properly certified PA's and two to three full-time physicians are needed on site. Tr. at 175–76, 218, 268, 1048, 1052, 1068, 1071–72. The experts also made clear that 24–hour, on-site medical coverage is needed for adequate care. Tr. at 218, 1060.

### 3. Emergency Care

Not only do many correctional officers lack training in cardiopulmonary resuscitation ("CPR"), but certain medical staff lack training in this vital skill, as well. Tr. at 903; Plaintiffs' Exhibit 23 at 21. Not surprisingly, the medical experts consider CPR training for medical personnel and correctional officers to be crucial. Tr. at 210–11, 1060–61.

When plaintiffs' expert, Dr. Braslow, first visited Occoquan in August 1986, he found no properly equipped ambulance and only inadequate emergency equipment on-site. Tr. at 210; see also Tr. at 902; Plaintiffs' Exhibit 21 at 15. According to uncontroverted expert medical testimony, there should be at Occoquan adequate emergency equipment, including a well-provisioned ambulance. Tr. at 218, 1060. These steps are all the more important given the absence of medical personnel at Occoquan on the midnight shift, requiring the transport of ill or injured inmates to other facilities. Tr. at 875–77. There is still some question as to whether defendants have addressed adequately this problem. Compare Tr. at 874 and Plaintiffs' Exhibit 23 at 23.

Other testimony was offered indicating the systemic nature of the problems with emergency care at Occoquan. For instance, it was told how an inmate who blacked out and struck his head on the back of a bunk waited 45 minutes for a stretcher to arrive, so that he could be evacuated. Tr. at 396. Dr. Braslow testified that another inmate was forced to wait over one hour before being transferred to Central Facility for emergency care after suffering a head injury. The inmate then required evaluation at District of Columbia General Hospital. Tr. at 212.

### 4. Chronic Care and Records

There is no organized, formal system for follow-up care of inmates at Occoquan, in areas including medication refills, evaluation of chronic-care inmates, and return appointments. Tr. at 180–81, 1049, 1065. By way of example, Dr. Braslow noted the inadequate management of some diabetic inmates, failure to renew timely an inmate's seizure medication, and failure to follow up on another inmate in need of suture removal, which was required to treat multiple stab wounds. Tr. at 182–85.

Another area of concern is the significant delays in transferring inmates' medical records to Occoquan following their

processing at the D.C. Jail. Delays are also common in transferring inmates' medical records from D.C. General Hospital to Occoquan following consultation with specialists. Occasionally, records are never transferred. Tr. at 187, 853, 1031, 1036, 1079; Plaintiffs' Exhibit 21 at 10. Based on his review of certain medical records, Dr. Braslow testified about various instances of inmates who failed to receive important medication or follow-up treatment attributable to these delays and/or failure of medical staff to review the records upon receipt at Occoquan. Tr. at 187–93, 197; Plaintiffs' Exhibit 11.

The need to ensure the efficient and timely transfer of medical records with the respective inmate so as to provide adequate medical care is obvious to the layman, let alone the medical expert. Tr. at 188, 1036, 1072–73. Defendants' medical expert believes that additional records and clerical personnel are needed to alleviate this problem. Tr. at 1034–35.

### 5. *Screening*

All inmates entering the District of Columbia's correctional system are processed at the D.C. Jail. There, each inmate allegedly receives a complete physical examination, including screening for contagious diseases, specifically tuberculosis ("TB") and syphilis. Uncontroverted testimony indicated, however, that properly documented intake TB testing and syphilis testing ("serology") are not done routinely for Occoquan inmates. Tr. at 197–204, 1073–76; Plaintiffs' Exhibit 21 at 13. The medical experts also agreed that if a medical interaction or encounter is not documented in a medical record, one must conclude that the test or evaluation was not done. Tr. at 203, 303, 1073–74.

Dr. Braslow testified that one could expect to find positive serology tests with some frequency in a population such as at Occoquan. Tr. at 204; *see also* Tr. at 855 (10 percent to 20 percent of the Occoquan population). A similar percentage at the Occoquan population could be expected to test positively for TB. Tr. at 269–70, 1074–

75. To be sure, instances of infected inmates whose conditions were not documented or followed properly were adduced at trial. Tr. at 199–206; Plaintiffs' Exhibit 21 at 13–14.

### 6. *Specialty Clinics*

Inordinately long and significant delays are common in scheduling inmates for visits to specialty clinics, especially neurology and orthopaedic clinics. Tr. at 207–08, 874, 907, 1043, 1046; Plaintiffs' Exhibit 21 at 15–16. Dr. Braslow testified about one inmate who, on June 25, 1986, had been referred to the surgery clinic to be seen as soon as possible, but still had not been seen as of October 2, 1986. Tr. at 208.

### 7. *Medications*

At least as recently as the date on which the complaint in this action was filed, MTA's had been dispensing prescription medications to inmates despite the fact that they are not licensed properly or certified to do so. Tr. at 213, 907, 1063; Plaintiffs' Exhibit 22 at 13. In addition, the medication orders issued by PA's were not countersigned routinely by a physician, even though such a practice is required. Tr. at 213, 1063–64; Plaintiffs' Exhibit 21 at 14–15.

No system exists whereby inmates are followed to ensure necessary prescription renewals, and the record documentation of medication administration is incomplete. Tr. at 212, 1064–65; Plaintiffs' Exhibit 23 at 12. There also exists a persistent inability to ensure that diabetic inmates receive their insulin in a timely fashion so that it is therapeutically effective. Inmates must be transported to the Central Facility in handcuffs and chains to receive their insulin on weekends. Tr. at 303–04, 306.

### 8. *Dental Care*

There are currently two dentists and one dental assistant available to treat the Occoquan population. Tr. at 913–14. According to the chief dental officer at Occoquan, Dr. Allen, the dental clinic is too small and the staff is insufficient to handle the cur-

rent population's needs. Plaintiffs' Exhibit 19 at 13–14, 30–31, 41–42, 47. Dr. Allen and others note that the current population level at Occoquan is having a negative impact on dental care. Tr. at 214–15, 1064–65; Plaintiffs' Exhibit 19 at 25–26. That lengthy delays in obtaining dental care are common is buttressed by the numerous administrative complaints filed by inmates complaining of the pain they are suffering due to these delays. Plaintiffs' Exhibits 11; 22 at 6, 8.

## D. *Mental Health Services*

### 1. *Screening*

Mental health screening of all inmates should be performed by a trained mental health professional and appropriate psychological tests administered in order to identify those in need of psychological care. Tr. at 363–64. The experts agreed that the screening process conducted at the D.C. Jail is not successful in identifying all those suffering with serious mental disturbances. This is not surprising given that no formal mental health screening performed by trained mental health professionals is conducted there. Tr. at 341, 916; *see also Campbell v. McGruder,* No. 1462–71, slip. op. at 27 (D.D.C. July 15, 1985). At the same time, in place at Occoquan is only an informal system for screening inmates for psychological problems. Tr. at 353; Plaintiffs' Exhibit 6 at 1. This system, or lack thereof, is entirely inadequate. Tr. at 294–96, 363, 372.

### 2. *Mental Health Staff*

There are widely acknowledged deficiencies among the mental health staff at Occoquan. Tr. at 284, 301, 366, 380. These deficiencies are evidenced by a "burned-out" staff, overwhelmed by their work load. Tr. at 301, 366.

Such an impaired staff has an adverse impact on the quality of care. Tr. at 370. The psychiatrist is available only two hours per week. This limits each patient to about seven minutes with the psychiatrist, an amount of time within which it is "simply impossible" to evaluate one's mental state.

Tr. at 36, 352. There is a pressing need for additional mental health personnel, particularly given the numbers of inmates who are mentally disturbed. Tr. at 301, 303, 346, 356, 361.

### 3. *Q Block*

In addition to housing inmates on administrative and punitive segregation, Q block is used also to house mentally ill inmates until they can be examined by a psychiatrist and transferred to a proper treatment facility. Tr. at 298–99, 345. Both mental health experts agreed that Q block is an inappropriate place to house inmates suffering from serious mental health problems. Tr. at 299, 370. Indeed, placing such inmates in Q block will surely aggravate their condition. Tr. at 299.

Inmates in need of hospitalization for treatment of mental health conditions are not being transferred to St. Elizabeths Hospital (the District of Columbia's mental health institution) in some cases within 48 hours. While this is the reality, defendants' mental health expert testified that in no case should an inmate with a psychiatric problem be confined in Q block for more than 24 hours. Tr. at 370. There are also delays in nonemergency transferring of mentally disturbed inmates out of Q block. It may take more than one month for transfer to St. Elizabeths Hospital in such instances. Tr. at 353, 375.

### 4. *Medications and Records*

Certain mentally ill inmates at Occoquan are not receiving their prescribed medications. Tr. at 297. This represents a significant problem in that failure to maintain prescribed medication levels may aggravate dangerously the patient's psychotic state. Tr. at 298, 367. The effectiveness of the already stretched Occoquan mental health services is further taxed by the unavailability of various medical records, similar to the problem noted *supra* at 28–29.

## E. *Cumulative Impact*

The conditions at Occoquan, not to mention the experts on both sides and the Occo-

quan administrators, cry out for a population limit. PT at 29; Tr. at 91, 838, 841, 1200–01; Plaintiffs' Exhibits 17 at 36–37; 18 at 4–5, 75, 80–81. In June 1986, the District of Columbia's special consultant for correctional affairs, Ms. Kathryn Monaco, observed that:

> [T]he serious overcrowding the District now faces in those facilities not covered by court order poses a much more dangerous threat. In Occoquan I and II, inmates are crowded into dormitories with little or no chance for privacy, causing a great deal of tension with the result that normal prison management difficulties are compounded.... Experiences in prisons across the country demonstrates [sic] that overcrowding like that now existing at Occoquan I and II, which so sever[ely] inhibits any quality of life, results in violence. Unless remedied, this situation will result in a disturbance that will be costly in terms of human life and property.

Plaintiffs' Exhibit 6 at 3–4. Unfortunately, the July 1986 riot at Occoquan proved Ms. Monaco all too correct.

As indicated *supra* at 3, the Occoquan population is again approaching the level that existed at the time of the July 1986 riot. As demonstrated *supra, passim,* virtually every facet of the Occoquan system is at or beyond the breaking point. It is apparent that even with significantly fewer inmates, the physical plant and the various services and programs at Occoquan are, at best, substandard. This situation, taken cumulatively, presents a clear and present danger to the health and safety of plaintiffs. *See, e.g.,* Tr. at 292–94, 301, 312, 322–30, 357, 380–81, 1223–26.

## II. *Conclusions of Law*

### A. *Equitable Relief Is Appropriate*

Defendants suggest that recently implemented plans designed to alleviate many of the above-noted conditions should render the Court's intervention unnecessary. The Court wishes sincerely that were the case. The Court's experiences with the Department of Corrections, however, make "skeptical" the operative word.

First, the Court should only refrain from issuing a remedy where defendants satisfy the "heavy burden" of demonstrating that (1) the alleged improvements have "completely and irrevocably eradicated the effects of the alleged violation," *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979), and that (2) it is "absolutely clear" absent an injunction "that the allegedly wrongful behavior could not reasonably be expected to recur." *Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980). The Supreme Court explained the rationale of this stringent test in *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 288–89 and n. 10, 102 S.Ct. 1070, 1074 and n. 10, 71 L.Ed.2d 152 (1982):

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.
>
> . . . .
>
> Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave "[t]he defendant ... free to return to his old ways." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632[, 73 S.Ct. 894, 897, 97 L.Ed. 1303] (1953).

*See also United States v. Oregon Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952) (courts must be wary "of efforts to defeat injunctive relief by protestations of repentence and reform, especially when abandonment seems timed to anticipate suit and there is probability of resumption"); *Owens-El v. Robinson,* 442 F.Supp. 1368, 1374 (W.D.Pa.1978) (a prison conditions case "should be decided on the basis of the facts as they existed when the suit was filed ...").

### B. *The Eighth Amendment Standard*

Although the eighth amendment was perceived originally as a ban against whippings, floggings, and other forms of excessive punishment, it is a dynamic provision that draws its meaning from "the evolving standards of decency that mark the

progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958); *see generally* Granucci, *"Nor Cruel and Unusual Punishment Inflicted": The Original Meaning*, 57 Calif.L.Rev. 839 (1969). The prohibition against cruel and unusual punishment is not limited to specific acts directed at select individuals, but is equally applicable to general prison conditions that are violative of these "evolving standards of decency." *See also Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978) ("Confinement in a prison ... is a form of punishment subject to scrutiny under Eighth Amendment standards.")

The eighth amendment prohibits conditions of confinement that: (1) "involve wanton and unnecessary infliction of pain"; (2) are "grossly disproportionate to the severity of the crime warranting imprisonment"; or (3) "alone or in combination may deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). In determining the "contemporary standards of decency," the courts are urged to rely on " 'objective factors to the maximum possible extent.' " *Id.* at 346, 101 S.Ct. at 2399 (quoting *Rummel v. Estelle*, 445 U.S. 263, 274–75, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980)).

### C. *The Eighth Amendment Violations*

#### 1. *Overcrowding and the Totality of the Conditions*

*Hutto v. Finney*, 437 U.S. at 687, 98 S.Ct. at 2571, instructs that conditions of confinement should be "taken as a whole" to assess the aggregate impact on the imprisoned. *See also Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399 (prison conditions "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities."). "This realistic approach derives from the understanding that life within a correctional facility is not life within a vacuum, and a stress on one aspect will result, through interrelation and interaction with other conditions within the institution, in an intensi-

fied cumulative impact on the inmates." Comment, *Constitutional Law—Eighth Amendment—Double Celling of Long-term Inmates—Cruel and Unusual Punishment—Rhodes v. Chapman*, 28 N.Y.L. Sch.L.Rev. 519, 526 n. 49 (1983); *see also Laaman v. Helgemoe*, 437 F.Supp. 269, 323 (D.N.H.1977) ("The touchstone is the effect upon the imprisoned.").

Every facet of the operation at Occoquan is characterized by systemic deficiencies. While any one component, *i.e.*, harmful noise levels, food services, etc., may not fall below the prescribed eighth amendment standard, the cumulation of the various deficiencies aggravated and exacerbated by an ever-increasing number of inmates creates a constitutionally unacceptable situation. Such was the case in *Johnson v. Levine*, 450 F.Supp. 648, 654–57 (D.Md.), aff'd as modified per curiam, 588 F.2d 1378, 1380–81 (4th Cir.1978), where the district court held that inmate idleness, harmful noise levels, strains on the food system, sanitation and prison security were "directly related to overcrowding" and when "weighed in their totality, these conditions ... result[ed] in deprivation of rights guaranteed ... by the Eighth Amendment."

Occoquan inmates are confined in poorly supervised dormitories; inmates are classified in a haphazard fashion, and the paucity of programs makes idleness the inmates' chief occupation. The dormitories are not clean, much less sanitary; the sustained noise levels are excessive, and the ventilation in these compact quarters is marginal, at best. Fire safety at Occoquan is evidently a casual concern and the food services operation is, by any estimation, severely overburdened. The Court was presented with evidence and heard testimony which indicate that the rate at which inmates suffer physical assaults is significantly higher than defendants' statistics would lead one to believe. Though the psychological damage and heightened level of tension that such conditions exact elude precise quantification, their presence is manifested

in acts of physical violence and ever-present fear.

Conditions such as those at Occoquan have provided other courts with ample grounds for finding eighth amendment violations. *E.g., Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522; *French v. Owens,* 777 F.2d 1250 (7th Cir.1985); *Campbell v. McGruder,* No. 1462-71, slip op. (D.D.C. July 15, 1985); *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977). While the Court recognizes that the facts unique to any one prison conditions case make comparisons difficult, it is no less true that the conditions at Occoquan, exacerbated by overcrowding, amount to cruel and unusual punishment as measured by "contemporary standard[s] of decency." *See Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399.

### 2. *The Inadequate Health Care System*

"An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.... Such a failure may actually produce physical 'torture or a lingering death', ... or pain and suffering which no one suggests would serve a penological purpose." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (citations omitted) (quoting *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890)). Indeed, prison officials are obligated to provide all inmates ready access to adequate medical care. *Id.* at 104-05, 97 S.Ct. at 291. The health care system must meet both "the routine and emergency health care needs" of inmates. *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (quoting *Battle v. Anderson,* 376 F.Supp. 402, 424 (E.D.Okla.1974)).

The Supreme Court in *Estelle v. Gamble,* 429 U.S. at 104-06, 97 S.Ct. at 291, held that deliberate indifference to the medical needs of inmates constitutes an unnecessary and wanton infliction of pain proscribed by the eighth amendment. In *Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981),

the circuit court held that failure to screen adequately newly arrived inmates for communicable diseases was an omission " 'sufficiently harmful to evidence deliberate indifference to serious medical needs.' " *Id.* at 109 (quoting *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 293); *see also Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977) (eighth amendment is violated when "systemic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable.").

The Court makes special note of the poor medical services at Occoquan because of the added burden that the overcrowding places on these already inadequate services, in addition to defendants' cavalier attitude about this unsatisfactory and life threatening state of affairs. While the Court is careful to rely on model correctional standards only insofar as they provide guidance, it is noteworthy, though not surprising, that defendants' medical experts concurred in most instances with plaintiffs' experts in concluding that the state of medical services at Occoquan is quite poor. *See Bell v. Wolfish,* 441 U.S. 520, 543-44 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1978); *Estelle v. Gamble,* 429 U.S. at 103-04 n. 8, 97 S.Ct. at 290-91 n. 8.

The Court detects an attitude on defendants' part that the medical needs of their inmates are of little concern. *See Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 290-91. The evidence is plentiful: haphazard record keeping; unlicensed dispensation of prescription medicines; insufficient availability of sick call; insufficient medical staff; confused management; a chronic shortage of dental and pychiatric staff; and a barely functioning emergency care system. The suffering that these deficiencies cause is needless, results in purposeless infliction of pain with no conceivable penological justification, and violates plaintiffs' eighth amendment rights. *See Campbell v. McGruder,* No. 1462-71, slip op. at 44 (D.D.C. July 15, 1985); *see also Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (pro-

hibiting conditions "incompatible with the objectives of incarceration.").

### III.  Conclusion

By ruling for plaintiffs, the Court does not intend to make conditions at Occoquan comfortable, because harsh and restrictive conditions are a part of the penalty that offenders must pay for their transgressions against society. See Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. at 2399. At the same time, this country is made great by its adherence to humanitarian principles embodied in our Constitution and laws. These principles require magnanimously that we treat people compassionately and fairly, even as we punish them for their crimes. No value can be placed on such rights and principles, and, therefore, they must be guarded well and preserved in all instances. Indeed, "[t]he continuing guarantee of these substantial rights to prison inmates is testimony to a belief that the way a society treats those who have transgressed against it is evidence of the essential character of that society." Hudson v. Palmer, 468 U.S. at 523, 104 S.Ct. at 3198.

The numerous deficiencies at Occoquan, systemic in nature, exacerbated by chronic overcrowding, combine cumulatively to subject plaintiffs to cruel and unusual punishment, thereby violating their eighth amendment rights. While defendants may prefer to return to the days of the rejected "hands-off doctrine," see Note, Constitutional Rights of Prisoners: The Developing Law, 110 U.Pa.L.Rev. 985 (1962), the Court will intervene to ensure that plaintiffs' constitutional rights are observed. See Rhodes v. Chapman, 452 U.S. at 354, 101 S.Ct. at 2403 (Brennan, J., concurring).

The Court's intervention is all the more pressing given that further overcrowding at Occoquan appears to be inevitable. The Occoquan facilities are the only major institutions in the District of Columbia Department of Corrections that are not under a court-ordered population limit, making Occoquan the system safety valve. See Plaintiffs' Exhibit 6 at 1; see also supra at 12. This situation is to be changed shortly.

Furthermore, the Court knows of no plans that the District of Columbia has to alleviate the continuing pressure at Occoquan, except for the opening of a 200–bed modular unit sometime in the coming months, and the construction of a new jail scheduled to open in 1990, at the earliest. Plaintiffs' Exhibits 18 at 10; 33 at 2.

### IV.  The Remedy

The Supreme Court in Hutto v. Finney, 437 U.S. at 688, 98 S.Ct. at 2572, affirmed the proposition that once an eighth amendment violation is found, and the federal courts' equitable powers are invoked, the courts' power to remedy ongoing constitutional violations is broad. In Rhodes v. Chapman, 352 U.S. at 351–52, 101 S.Ct. at 2401–02, the Court cautioned, however, that the judicial duty to protect constitutional rights is but one of "oversight responsibility." See also Bell v. Wolfish, 441 U.S. at 562, 99 S.Ct. at 1886 (courts should avoid becoming "enmeshed in the minutiae of prison operations."). The primary responsibility for achieving the goals of the penal function in the criminal justice system, within constitutional parameters, is best left with the local government and prison officials. Rhodes v. Chapman, 452 U.S. at 352, 101 S.Ct. at 2402.

Accordingly, the Court will order that by June 1, 1987, the population of Occoquan I, II, and III shall not exceed a total of 1,281 inmates, with specific caps set for each dormitory. This total is based on a formula providing each inmate a total of 95 square feet of floor space for sleeping and day room purposes. If defendants provide all inmates with opportunities for work, vocational education or other meaningful programs to eliminate enforced idleness among the inmates, the Court will entertain a motion to modify the square footage formula to 85 square feet per prisoner. In connection with the establishment of a population cap at Occoquan, the Court will also order defendants to provide the Court with a written report by January 15, 1987, indicating precisely how they propose to comply with the population cap.

Second, the Court will order defendants to provide the Court with a written report by January 15, 1987, and every 30 days thereafter, indicating what steps are being taken to address the many deficiencies at Occoquan as noted in this opinion. The Court, of course, encourages defendants to go even further by adopting as their goal compliance with the enlightened standards established by the ACA, the APHA, and the Life Safety code. An order is attached.

### ORDER

This case was tried to the Court. For the reasons set forth in the accompanying opinion, it is by the Court this 22nd day of December 1986,

ORDERED that judgment is entered in plaintiffs' favor; it is further

ORDERED that any previous orders addressing the population at Occoquan are superseded by this order; it is further

ORDERED that no later than June 1, 1987, the population at Occoquan I, II, and III shall not exceed a total of 1,281 inmates; it is further

ORDERED that no later than June 1, 1987, each dormitory shall not exceed the capacities listed below:

| OCCOQUAN I | | OCCOQUAN II | |
|---|---|---|---|
| Housing Unit | Capacity | Housing Unit | Capacity |
| Dorm C | 68 | Dorm A | 61 |
| Dorm D | 68 | Dorm K-1 | 71 |
| Dorm F | 58 | Dorm K-2 | 71 |
| Dorm G | 68 | Dorm L | 68 |
| Dorm I | 41 | Dorm M | 68 |
| Dorm J-1 | 52 | Dorm N | 68 |
| Dorm J-2 | 60 | Dorm O | 60 |
| Q Block | 18 | Q Block | 18 |
| | 433 | | 485 |

| OCCOQUAN III | |
|---|---|
| Housing Unit | Capacity |
| Dorm 1 | 82 |
| Dorm 2 | 82 |
| Dorm 3 | 82 |
| Dorm 4 | 82 |
| Dorm 5 | 35 |
| | 363 |

it is further

ORDERED that no later than January 15, 1987, defendants shall submit to the

Court a written report indicating how they propose to comply with the above population limits; it is further

ORDERED that no later than January 15, 1987, and every 30 days thereafter, defendants shall submit to the Court a written report indicating their plans for addressing the deficiencies at Occoquan as noted in the accompanying opinion, at minimum; and it is further

ORDERED that this case is dismissed.