INMATES OF OCCOQUAN, et
al., Plaintiffs,

v.

Marion BARRY, Mayor, et
al., Defendants.

Civ. A. No. 86–2128.

United States District Court,
District of Columbia.

June 30, 1989.

Adjoa A. Aiyetoro, Edward I. Koren, Stuart H. Adams, Nat. Prison Project of the American Civ. Liberties Union, Washington, D.C., for plaintiffs.

Frederick D. Cooke, Corp. Counsel, Martin L. Grossman, Deputy Corp. Counsel, Paul A. Quander, Asst. Corp. Counsel, Washington, D.C., for defendants.

OPINION

JUNE L. GREEN, District Judge.

Plaintiffs, inmates confined at the District of Columbia's Occoquan Facility of the Lorton Correctional Complex, brought this action claiming violations of their eighth amendment rights under 42 U.S.C. § 1983. Plaintiffs seek declaratory and injunctive relief, contending that an excessive inmate population; deficiencies in environmental health and safety; food services; fire safety; medical and dental services; and mental health care, alone or in combination, violate the eighth amendment's prohibition against cruel and unusual punishment.

After certifying the plaintiff class pursuant to Federal Rule of Civil Procedure 23(b)(2), the Court conducted a ten-day trial

on the merits. On December 22, 1986, the Court filed its opinion and accompanying order entering judgment in plaintiffs' favor. *Inmates of Occoquan v. Barry,* 650 F.Supp. 619 (D.D.C.1986). The Court found that the "numerous deficiencies at Occoquan, systemic in nature, exacerbated by chronic overcrowding, combine cumulatively to subject plaintiffs to cruel and unusual punishment." *Id.* at 634. As a remedy, the Court imposed an institution population cap of 1,281 and subjected each of the nineteen housing units within the Occoquan Facility to individual population caps.

The Court of Appeals for the District of Columbia Circuit vacated and remanded, finding that the population cap was too broad a remedy. *Inmates of Occoquan v. Barry,* 844 F.2d 828, 844 (D.C.Cir.1988). The Court of Appeals also found error with the Court's "continuous resort to the standards articulated by professional agencies in evaluating the constitutionality of the conditions at Occoquan." *Id.* at 843. The Court of Appeals stated that this Court should have "scrutiniz[ed] specific dormitories or services found to fall short of the constitutional minima." *Id.*

A trial to the Court was held upon remand to determine whether the conditions at Occoquan violate plaintiffs' eighth amendment rights, and if so, to determine the proper remedy.

### I. Findings of Fact

In the fall of 1988, defendants consolidated Occoquan I, II, and III into one facility. The three Occoquans became Zones I, II, and III, respectively. In addition, the J–1 Dorm became Dorm 6 and J–2 Dorm became Dorm 7, each a part of Zone III.[1] A detailed description of the composition of the Occoquan Facility is found in the Court's original opinion. *Occoquan,* 650 F.Supp. at 620. The population of the Occoquan Facility has risen steadily since the initial trial in 1986. On November 26, 1986, the population at Occoquan had risen to 1,637. *Id.* Before the present trial, the population had swelled to as much as 2,042 on November 2, 1988. Plaintiffs' Exhibit 266. This count far exceeds the level of 1,756 that existed at the time of the July 1986 riot. *Occoquan,* 650 F.Supp. at 620.

### A. Environmental Conditions

#### 1. Housing

##### a. Bathroom Facilities

General sanitation in the dorms is deplorable and the bathroom facilities are in terrible condition. First, there are insufficient numbers of showers and lavatories in many of the dorms. Even defendants' expert in the area of penology, and correctional practice and operations stated that "one could not argue that there should be more [toilets], more sinks [lavatories] and more showers." Vol. V at 157, lines 21–22.[2] Defendant Hallem H. Williams, Jr. stated that he was "concerned about the bathroom facilities in relationship to the number of beds." Plaintiffs' Exhibit 1 at 15 (Williams Deposition). Numbers of bathroom facilities, however, are just the beginning of the problem.

The showers are filthy. In K–1 Dorm, "icicle-like [stalactites]" hang down from the ceiling, the result of a long-term leak. Vol. II at 30, lines 15–17. The shower walls are filled with soap scum, *id.* at lines 21–25, and the walls are covered with mold. *Id.* at 31, lines 1–9. In L Dorm, "soapy, smelly water" oozed out of a cracked baseboard and the walls were covered with mold. *Id.* at lines 15–18. Plaintiffs' environmental and health expert, Ward C. Duel, testified that these conditions "[show] that cleaning has been consistently inadequate over a period of time." *Id.* at lines 4–5. Soap scum is prevalent not only on the shower walls, but also along the floor. There are pathways of soap scum between the showers, but where people

---

1. Zone I includes Dorms A, C, D, F, G, and I. Zone II includes Dorms K–1, K–2, L, M, N, O, and Q. Zone III includes Dorms 1 through 7.

2. There are seven volumes of transcripts from the January 1989 trial. Volumes I through V are marked as volumes while the transcripts from January 17 and 18, 1989, are not marked. The Court will refer to these two days as Volumes VI and VII, respectively.

stand to dry, the soap scum has been worn off by traffic. *Id.* at 32, lines 4–11.

During Mr. Duel's tour, he came across a toilet in Dorm 4 that was stopped up. A newspaper was covering the toilet, "but, even so, as you walk[ed] by the area, you could smell the decomposing feces." *Id.* at 39, lines 10–15. When asked why the toilet was in such sad shape, the officer in charge and the inmate porter stated that they "had not been able to get it repaired for a considerable period of time." *Id.* at lines 18–20.

This type of problem is systemic. Numerous toilets did not work and leaking pipes were found throughout the Occoquan Facility. Mold grows on the wet walls, paint peels from lack of proper ventilation and tiles have fallen off the ceiling or have come up from the floor due to the moisture. Q Block toilets are in foul condition. The toilets are surrounded by cement, with no lids. Due to leaking flush buttons, the paint on the toilets' walls is cracked and peeling, with mold growing in the cracks. *See* Plaintiffs' Ex. 22, BW Photos 2–31, 5–30, 6–12, and Color Photo 1–4. Filthy toilets are a common problem throughout Q Block, along with thick soap scum in the showers. Plaintiffs' Ex. 42 at 68. Since there are no toilet seats, the toilet is rough with peeling paint. Vol. II at 40, lines 13–15; Plaintiffs' Ex. 22, Color Photo 1–4. The Q Block sanitary fixtures are dirty, dilapidated, and depressing.

The toilets in the main dorms are not much better. Many urinals leak. Some leaks are due to washers, others are due to leaking seals or cracked bowls. Toilet flush valves leak and the sewer pipe in Dorm 1 dripped into a toilet. Plaintiffs' Ex. 42 at 57. Stalactites were hanging from an overhead sewer pipe, due to a long-time leak. *Id.; see also* Plaintiffs' Ex.

22, Color Photo 2–12. In Dorm 7, in addition to leaking urinals and pipes, water from the restroom above the toilet area was leaking through the ceiling and water was running out of the wall in the restroom. Plaintiffs' Ex. 42 at 57–58. In other dorms, toilets were loose from the floor, along with leaking flush buttons.

A closer look at the ratio of sanitary fixtures to inmates shows that most dorms far exceed the ratio suggested by national standards. The American Correctional Association (ACA) and the American Public Health Association (APHA) set the following number of inmates per fixture:

| Standard | Inmates per Fixture | | |
|---|---|---|---|
| | Lavatories | Toilets | Showers |
| ACA | 6 | 8 | 8 |
| APHA | 8 | 8 | 15 |

*See* Plaintiffs' Ex. 42 at 64.

While D and F Dorms are generally within these standards with 8/10 inmates per toilet, 18/10 inmates per lavatory, and 8/14 per shower, respectively, the remaining dorms are overextended. *Id.* For example, the ratio of inmates to showers in A Dorm is 55.[3] Dorm 6 is one of the worst with 22 inmates per toilet,[4] 50 inmates per lavatory,[5] and 38 per shower. *Id.* C Dorm is not much better with 10 inmates per toilet,[6] 18 per lavatory,[7] and 30 per shower.[8]

Another problem with the bathroom facilities is the regulation of water temperature. Mr. Duel testified that he had a series of inmate porters tell him that when they flush a toilet, the shower water becomes scalding. Vol. I at 178, lines 17–20. He tested this in Dorms 5 and 6. When a toilet was flushed in Dorm 5, the temperature jumped from 105° to 124°. At 124°, the skin is damaged within 15 seconds. *Id.* at lines 22–24. In Dorm 6, the temperature jumped from 106° to 138°. *Id.* at 178–79.

---

**3.** Plaintiffs' expert did not count two temporary showers that were being remodeled. Plaintiffs' Ex. 42 at 64.

**4.** One toilet was not counted since it leaked and was loose from the floor. *Id.*

**5.** One lavatory was not counted since it was stopped up. *Id.*

**6.** A cracked toilet was counted. *Id.*

**7.** Two lavatories were not counted since they would not shut off. *Id.*

**8.** One shower was not counted because it ran constantly. Two others dripped but were counted. *Id.*

Mr. Duel also ran a short test on the showers in Dorm 5. After turning on one shower at a suitable temperature, he turned on two more. The second shower did not affect the temperature, but when he turned on the third shower, the first shower "fluctuated back and forth from quite cold to very hot." Plaintiffs' Ex. 42 at 58.

During Mr. Duel's December tour of Occoquan, he discovered a dangerous problem in Dorm 5. Water was leaking through the back wall where two electrical boxes were located. When the boxes were opened, one was rusty and the other had water seeping out of it. Vol. I at 180, lines 1–13. A mattress was on the floor by the electrical boxes and was soaked. Blankets were wedged around the mattress to keep water from running out into the main sleeping area. Id. at lines 15–19. Sheets were hanging on the electrical conduit to catch the dripping water. Slime and mold was on the wall behind it. Id. at lines 21–25. See Plaintiffs' Ex. 22, Color Photo 1–20.

Mr. Claude Morgan, the Maintenance Foreman at Occoquan, stated that they had been trying to find the source of the leak in Dorm 5 since about mid-November. He was aware of the mattress on the floor sopping up water. Plaintiffs' Ex. 13 at 13 (Morgan Deposition). He was also aware of the scalding water in the showers and at the time of the deposition, nothing had been done to fix it. He stated that the water lines that supply Dorms 6 and 7 are inadequate. Id. at 14. He believed that Dorms 6 and 7 were scheduled to be remodeled.

As for preventive maintenance, Mr. Morgan stated that they did not have time for it. It is a matter of repairing things on a daily basis. Id. at 19. He believed he had to replace about 12 toilets over the past year, and only about 6 of those were in stock. Id. at 7. Depending on when the toilets are ordered during the fiscal year, he stated that the delays could be three or four months. Id. at 8.

Mr. Duel also testified that he did not see any evidence of Occoquan's housekeeping manual being used. Vol II at 42, line 24.

He stated that the sanitary supplies and cleaning procedures listed in the manual were not available. Id. at 43, lines 1–4; see also Plaintiffs' Ex. 33i. Especially as to the showers, he stated that there were no brushes or detergents that should be used on the showers. Vol II at 57, lines 1–14. An inmate supervisor, Mr. Stephen H. Simms, Jr., also testified that there was a lack of cleaning supplies. He stated that they were not able to get the greasy scum off of the walls and floors of the bathroom because there were no scrub brushes and the disinfectant they have will not remove the scum. Vol. IV at 68–70.

Mr. Duel also testified that Occoquan has a self-inspection program where the facility is supposedly inspected daily and corrective actions are taken accordingly. Vol. II at 43, lines 7–10. After inspecting all of the leaking and broken toilets, other leaks from pipes and walls, and leaking showers, Mr. Duel testified that he could not see any evidence of a self-inspection program. Id. at lines 13–15.

b. *Living Areas*

In addition to the living areas being crowded with bunks, the dorms at Occoquan suffer from disrepair and neglect. Many dorms are dirty and have peeling paint, broken floor and ceiling tiles, and torn furnishings.

Dorm 7 is particularly dirty and dusty, with dirt from the recreation yard and coal dust from the adjacent coal pile blowing into the dorm. Mr. Kenneth Neely, an inmate housed in Dorm 7, testified that Dorm 7 had holes in the walls and ceilings, with pipes that leak from the ceiling. Vol. III at 26, lines 20–21.

Asbestos has been found in Dorms 5, 6, and 7. Mr. Duel testified that in September of 1988, he discovered asbestos in the broken insulation of the piping over the beds in Dorm 5. Vol. I at 188, lines 12–22; see also Plaintiffs' Ex. 42 (American Microscopy Lab, Inc. Report) and BW Photos 8–12 and 8–14. Mr. Lisandro Herrera, an area supervisor at Lorton, testified that asbestos had been discovered and that officials were "in the process of writing a

change order to the contract to remove it." Vol. VII at 19, lines 8–11. At the time of trial, the renovation plans did not include a provision for the removal of asbestos. *Id.* at 22, lines 3–18.

Contractors working for defendant located asbestos in Dorms 5, 6, and 7, and recommend removal since it can not be encapsulated or enclosed safely. *See* Defendants' Building Inspection Reports.[9] There is no documentation that the asbestos has been removed.

### 2. Fire Safety

There is a serious fire safety hazard at Occoquan. There are no fire alarm systems in Dorms 5, 6, or 7. Vol. I at 14, lines 21–22. Thomas Jaeger, plaintiffs' fire safety expert, testified that the fire alarm systems in I and K Dorms, and Dorms 3 and 4 were inoperative. *Id.* at lines 23–24. In addition, there is no emergency power backup or secondary power backup to the fire alarm system. *Id.* at 19, lines 7–9. Smoke detectors are also lacking in many of the dorms and those that did exist were inoperative in some dorms. *Id.* at 15, lines 1–7.

Mr. Jaeger observed that fewer fire alarm systems and smoke detectors were operational in 1988 than in 1986. He stated that "[t]he condition had deteriorated since 1986." *Id.* at 27, lines 9–17. He also noted that many of the doors at Occoquan swing in the wrong direction. In case of an emergency, the doors should swing outward to accommodate the crush of people exiting the building. Many of the doors at Occoquan swing inward instead of outward.[10]

Mr. Jaeger noted additional fire hazards in Dorms 5, 6, and 7. The inmates had placed blankets and sheets up against the window to block the cold air. *Id.* at 44, lines 9–12. This is dangerous because cloth hanging in this manner with air all around it burns rapidly. Any material hung this way must be fire-retardant. *Id.* at lines 16–23.

Mr. Jaeger observed vast discrepancies between evacuation plans located in the same dorm. For example, in I Dorm, one of two plans posted side by side directs inmates to evacuate through a sealed door. *Id.* at 29, lines 22–25. The plan in F Dorm directs inmates to evacuate through a non-existent rear door. There are side exits only in this dorm. *Id.* at 30, lines 11–16.

There are other conflicts within the Occoquan evacuation plans. One section instructs the correctional officer in the dorm to release the·inmates in the building upon the fire alarm, *id.* at 16, lines 23–25, and another portion states that "No correctional officer shall release any inmates without direction of a shift supervisor." *Id.* at 17, lines 1–3. This can cause serious confusion during an actual emergency. A conflict exists between the Occoquan plan and the Fairfax County Fire Department plan. The Occoquan plan directs one officer to report to the sally port to meet the Fairfax County Fire Department while the fire department requires a minimum of four officers to report to the sally port in order to enter the site. *Id.* at lines 15–19. This could have serious consequences during an emergency.

The Occoquan plan, readopted on August 17, 1988, requires an annual fire drill, but it does not require one for every shift. *See* Plaintiffs' Ex. 45 at ¶ 4E. Some officers assigned to particular areas have not participated in fire drills in the last two years. Plaintiffs' Ex. 9E at 38; Plaintiffs' Ex. 9A at 77.

Another fire safety problem is in Q Block. In order to release all of the occupants in Q Block, 48 locks must be opened with 5 different keys. None of the keys are color coded. In addition, they are all notched in an identical fashion, which makes identification impossible during an emergency when there are no lights or if the area is filled with smoke. Vol. I at 86–87. Q Block is the only housing that is

---

9. These documents were submitted to the Court after trial pursuant to this Court's Order of January 18, 1989, in order to supplement the record.

10. For example, such doors were found in Q Block, Vol. I at 31, lines 19–20; Dorm 5, *id.* at 37, lines 17–18; Dorm 7, *id.* at 42, lines 23–24; and A Dorm, *id.* at 47, lines 12–15.

by cell instead of dormitory. It is critical that each cell be opened quickly and efficiently during an emergency.

### 3. Food Service

Mr. Duel testified that a food-borne illness can be caused in two ways. Organisms that grow on food and ingested by mouth can subsequently grow in the body. Other organisms can exude a toxin which causes food poisoning. Vol. I at 156, lines 13–23. This can be prevented by maintaining food at its proper temperature. *Id.* at lines 8–10.

Mr. Duel testified that there had been improvements in the kitchen since 1986. Defendants have added "refrigeration equipment, walk-in coolers [and] walk-in freezers." *Id.* at 159, lines 8–9. Work has been done by the loading dock where the compacter was leaking and defendants have repaired the concrete so the swill will wash out more easily. *Id.* at lines 11–15. He did not observe any filters missing over the stoves. *Id.* at lines 16–19. Defendants also began remodeling some outdoor storage areas in December 1988. *Id.* at lines 23–25.

The main problems Mr. Duel noted during his inspections were food temperatures in Q Block and at the main dining room near the end of the feeding. *Id.* at 147, lines 10–12. He also found dish washing problems with the failure to sanitize pots and pans. *Id.* at lines 15–17.

He stated that hot food should be at least 140 degrees. *Id.* at 149, line 17. For example, gravy was tested at 119°, Q Block noodle dish was 124° and veal patties were 117°. *Id.* at 150–51. He explained to the Court that the Food and Drug Administration recently has placed cooked rice on the hazardous food list because organisms easily grow in it when it is below the recommended temperature. *Id.* at 152, lines 12–13. He tested rice at Occoquan in December 1988 and it registered at 96°, far below the required 140°. He stated that 96° was an almost ideal incubation temperature for organisms that cause food poisoning in rice. *Id.* at lines 9–11.

He also observed that the temperature of the rinse water in the dishwasher was not hot enough to sanitize. *Id.* at 154, lines 6–8. Trays that had been washed were still dirty and they were stacked while wet. *Id.* at lines 9–14.

In his opinion, many of the problems he observed were due to the number of people being served. The dining room does not have time to clean and sanitize dishes between feedings. The tables are not cleaned between eaters and there is an extended serving period where the food is held for a long time before serving all of the inmates. Due to the equipment, food has to be prepared far in advance of its being cooked. The kitchen begins cooking the noon meal at breakfast time and at noon, they begin preparing the evening meal. *Id.* at 157.

### B. *Medical Services*

There are major failures in the medical services provided at Occoquan even though there have been some improvements since 1986. Continuing problems exist with screening, sick-call, specialty clinics, and treatment and follow-up of chronic illnesses. Dr. Charles Braslow, plaintiffs' expert in the delivery of health services in a correctional facility, toured Occoquan on October 3, 1988 and December 21, 1988. The first time he toured the medical area in Building A, the pharmacy and the dental area. On his second visit, most of the medical facilities had been moved to the Administration Building, so he toured it and revisited the dental area.

### 1. Screening

Inmates entering the District of Columbia's correctional system are processed at the D.C. Jail. Each inmate is supposed to receive a complete physical examination, including screening for contagious diseases, specifically tuberculosis (TB) and syphilis. Vol. II at 125, lines 20–25. Out of 27 charts that Dr. Braslow reviewed for this purpose, only 4 had the results of their syphilis test. For example, in one chart, Dr. Braslow found a memo from the Metropolitan Health Services Lab, dated May 10, 1988, which indicated that the inmate's

blood sample was too small to do the test. At the time Dr. Braslow reviewed this chart in December, no follow-up test had been completed. In fact, there were three previous positive syphilis tests in his record from earlier admissions. *Id.* at 126.

As for TB, out of the 27 charts reviewed by Dr. Braslow, 10 showed no indication of the result of the TB test that had been given. In another 14, the staff accepted the patient's own statement of having a negative test in the recent past. One chart had no indication at all. On another chart, the inmate had returned the TB test card with the positive reaction box checked in July 1988. No follow-up was done to check whether the test was actually positive. *Id.* at 129.

Although there is a low incidence rate of TB at Occoquan, Dr. Braslow was concerned because the incidence rate in the country as a whole is on the rise. He stated that "it is particularly common among populations with histories of intravenous drug abuse and with histor[ies] of alcoholism and within inner cities which is certainly the type of population that Occoquan draws from." *Id.* at lines 13–23. Since TB is transmitted through droplets in the air, the risk of being infected in the poorly ventilated, crowded dormitory is dangerously high.

### 2. Staffing

The Occoquan facility utilizes Physicians Assistants (PA's) and Medical Technical Assistants (MTA's), as well as physicians. PA's receive two years of training in medical knowledge and are trained to work under the supervision of a physician. Most states, except New Jersey and the District of Columbia, require PA's to be licensed. MTA's are medical assistants and have some training, generally in the Armed Forces. There is no licensing requirement for MTA's and there is no standard way to verify the amount of training that they have received.

Dr. Braslow testified that the staffing had decreased between his October and December visits. In December on the 8–to–4 day shift, there were two physicians on staff, which was down from the three in October. One physician had gone to another position. There were four PA's on staff, which was two less than in October, and there were three MTA's, one less than in October.

On the 4–to–12 shift, there was one physician and a second slot for a PA, which was filled by a MTA or PA working overtime from the day shift. There were no medical staff present on the 12–to–8 shift. Vol. II at 105–06.

Since there are no medical staff present on the 12–to–8 shift, emergencies are handled at the Lorton Central Facility, about 3–½ miles from Occoquan. Dr. Herman E. Branson, the Chief Medical Officer at Occoquan, stated in his deposition that he has had complaints from inmates about the emergency service during the 12–to–8 shift. Plaintiffs' Ex. 8 at 12. He believes that about two ancillary medical workers would be adequate staff for this shift. *Id.*

Dr. Branson stated that Occoquan was at the lower spectrum of staffing levels by having more residents per physician. *Id.* at 9. As a result, MTA's do more diagnostic evaluations than they are qualified to do. Dr. Braslow observed MTA's during sick call interviewing inmates and making notations in the day's log book. Out of 49 inmates seen that day, only 5 were referred to physicians. The remaining inmates had their entire encounter with MTA's. No notations were made in their medical records. In fact, most of the medical records were not even utilized. Vol. II at 116–17.

Dr. Braslow testified that the use of MTA's for primary medical care is inappropriate since they are not licensed and are seldom supervised as they should be. For example, one inmate came in complaining of abdominal pain. The MTA made the notation in the daily log book but neither referred him to a PA or a physician nor noted the fact in his medical record. *Id.* at 117–18. He had to come back the next day complaining again, at which time he actually saw a PA. Another inmate was issued medication for high blood pressure when four days earlier, a physician wrote a note

in his record to monitor the inmate's blood pressure for awhile *without medication.* The MTA issued the medication without checking the blood pressure or following the physician's order. *Id.* at 118–19. These are just a few of the illustrations Dr. Braslow used at trial to show the manner in which MTA's are used.

3. Sick Call

At the time of the 1986 trial, sick call had been reduced from five days per week to three days per week due to the increase in population. *Occoquan,* 650 F.Supp. at 627. Sick call has been increased to five days per week, but problems still plague the system. To begin, sign-up for sick call does not occur until after midnight for the following day. Vol. IV at 158. After arriving at sick call, inmates see MTA's initially. Most never see a physician or even a PA before they leave the building.

During the time of trial, the medical services had been moved to temporary quarters while the old quarters were renovated. The temporary area is congested. Vol. II at 103. The initial interview takes place with MTA's in one open room. There are no real examination tables or medical equipment. *Id.* at 116A. These encounters are conducted without access to medical records. Few inmates are referred to a physician in the main area where access to records is possible.

4. Follow-up Care and Records

There is no organized system for follow-up care of inmates requiring refills for medication, return appointments or who have chronic illnesses. For example, one inmate complained of frequent urination. A urine culture was done, showed bacteria in the urine and he was started on antibiotics. There was no follow-up to determine if he still had a urine infection. Dr. Braslow testified that a urine infection treatable by antibiotics is abnormal in a male. It would have required further evaluation. Vol. II at 134.

Another inmate complained of dizziness and upon examination, had an irregular heart beat. He had a history of drug use, anemia, and was a kidney donor. The examiner ordered an electrocardiogram, blood tests, and a follow-up at D.C. General as soon as possible and ordered his blood pressure to be monitored. He came back two weeks later on his own to check on his appointments which were still needed. After another two weeks, his legs were swollen, he had headaches and dizziness and his pulse was irregular. He was placed on medication at this point. After a total of three months, his clinic appointment came up at D.C. General. He was not able to go since there was no transportation available. He was rescheduled for over two months later. It took from July 15 to December 27 to get this inmate to D.C. General for just an appointment. *Id.* at 135–36.

Dr. Braslow indicated that another inmate had a past history of Hodgkin's disease. The D.C. General Cancer Clinic ordered that he receive temperature checks twice a day, beginning December 13, 1988. When Dr. Braslow reviewed his chart on December 21, one week later, there were no temperatures taken and none recorded on his chart. There was no way to monitor his progress. *Id.* at 136–37.

Dr. Braslow was also concerned with the treatment of diabetics in Occoquan. After reviewing the daily logs of diabetics, he found that urine checks were done rarely and very few blood sugars were completed to monitor the diabetics.

One inmate, who was on high doses of insulin, was in and out of the infirmary several times due to low then high blood sugar tests. He was discharged with a blood sugar level of 56 (normal is between 100–200). Three weeks later he had a severe insulin reaction with a blood sugar level of 31. He was treated and the PA noted in his chart to evaluate his fasting blood sugar and to adjust the insulin dose. None of this was done and there was no further indication on his chart that he was evaluated in any way. Dr. Braslow testified that someone who is on large doses of insulin could have permanent brain damage from having too low blood sugar. *Id.* at 143.

There were several other inmates who were scheduled for fasting blood sugar and the tests were never done. *Id.* at 144. Others should have been checked as to doses of insulin or other monitoring and were not checked. *Id.* at 144-46.

Dr. Jenkins, the Assistant Director of Health Services for the Department of Corrections, testified that the Quality Assurance Committee has not evaluated the follow-up procedures at Occoquan. He said they had plans to do so in the future as a part of their auditing system. Vol. IV at 195, lines 9-15.

Another major area of concern which is linked with the follow-up care is medical records. There are significant delays in transferring inmates' medical records to Occoquan following their processing at the D.C. Jail. Some records never arrive. Dr. Jenkins acknowledged that there was a problem with the medical records following the inmates. He stated there would always be problems "in any kind of medical system with the way it works, especially when you increase the movement." *Id.* at 195-96.

Dr. Branson stated that inmates arrive at Occoquan regularly with no medical records, despite departmental orders against this practice. Plaintiffs' Ex. 8 at 31; Vol. II at 124. Without their medical records, the staff cannot determine if they require testing, monitoring, or present a risk to the general population. As stated previously, there are no results of TB or syphilis tests and there is no information as to chronic diseases.

### 5. Specialty Clinics

Inmates experience inordinately long delays in scheduling visits to specialty clinics. There are chronic problems with appointments to the eye clinic. One inmate was referred to the eye clinic in May 1988 for visual problems. He was seen three more times in June and July. As of December 31, 1988, he had not been seen for the eye examination. *See* Plaintiffs' Ex. 32d.

In 1987, an inmate was told in response to his Administrative Remedy Procedure (ARP) he was "on the list" to see the eye doctor, but "since the eye clinic only sees a small number of residents twice a month, the delay could be significant." Plaintiffs' Ex. 37d. He was instructed to "wait your turn." *Id.* Another inmate waited over a month for an eye appointment, and was then told "owing to a backlog, examinations have been discontinued for approximately one month, as eyeglass fittings are made in the interim. Your examination will take place as soon as the backlog has been reduced." Plaintiffs' Ex. 37n.

Inmates experience even longer delays in receiving neurology and urology clinic appointments at D.C. General. Inmates must wait anywhere from three to eleven months to get an appointment. Vol. II at 150-52.

Another inmate experienced a six-month delay in scheduling an x-ray at D.C. General. *Id.* at 152. There is no x-ray equipment at Occoquan. Inmates have to go to the Central Facility for x-rays. The absence of this equipment delays treatment. Plaintiffs' Ex. 8 at 16.

### 6. Dental Care

During the 1986 trial, there were two dentists and one dental assistant at Occoquan. *Occoquan,* 650 F.Supp. at 629. Currently, there are two dentists and two dental assistants who work Monday through Friday from 7:30 a.m. until 4:00 p.m. There are an additional dentist and dental assistant who work from 4:00 p.m. until midnight. Plaintiffs' Ex. 12 at 7-8.

Dr. Braslow testified that this staffing is adequate, but was concerned about the number of patients that were actually seen. Dr. Allen, the Chief of Dental Services for the Department of Corrections, stated in his deposition that Occoquan had a two-chair clinic which limits the number of inmates that can be seen at one time. The clinic was built when Occoquan was a small facility for misdemeanors and a population of about 200. They are still operating out of the same clinic while the population has soared to about 2,000. Dr. Allen indicated that the clinic is under renovation to in-

crease to five chairs and should be ready in about one year. *Id.* at 27–29.

Although the staffing may be adequate, there are numerous administrative complaints filed by prisoners complaining of the delays and of being put off by the dental staff. One inmate tried for over three months to get a crown recemented to his tooth. One of the problems was locating his medical record. As a result, he had to go to the medical clinic for a physical before he could receive dental treatment. Plaintiffs' Ex. 37b. These delays could have been avoided easily. Other inmates' treatments have been delayed due to misplaced medical records. Plaintiffs' Ex. 37h & 37t.

### C. *Mental Health Care*

Dr. Frank Rundle, plaintiffs' expert in psychiatry, toured the Occoquan facility on December 15 and 16, 1988. He was also qualified as an expert in the 1986 trial.

#### 1. Staffing

There are only two psychologists on staff at Occoquan. Robert E. Jones, Jr., the Chief Psychologist at Occoquan, is responsible for over 1,200 inmates in Zones I and II. Plaintiffs' Ex. 16 at 4. Anthony J. Rapone, the other psychologist, is responsible for over 700 inmates in Zone III. Plaintiffs' Ex. 15 at 4. The Department of Corrections does not have a psychiatrist. A psychiatrist from outside of the department comes two afternoons a week. Plaintiffs' Ex. 16 at 6.

In his deposition, Mr. Jones stated that he had trouble administering health-care services at Occoquan. He stated that they "were supposed to implement programs, provide [individual] and group psychotherapy; to handle the psychiatric visitations we have there; and to oversee the taking of medicine, and follow up the people who are on medication." Plaintiffs' Ex. 16 at 3–4. However, due to the lack of staff and hours required, "the only real service they get is psychiatric." *Id.* at 4. He believed that Occoquan needs a minimum of five psychologists, perhaps a psychometrist, and an upper-level clerical to handle the

computer programs. *Id.* at 5. He also stated that Occoquan needs at least two full days of psychiatric time. As it is, there is difficulty just scheduling inmates for treatment, without much time at all for a comprehensive method of treatment. *Id.* at 6.

Mr. Jones stressed that he had no staff. He even types his own psychological evaluations. *Id.* at 10. There is a large backlog of inmates that need testing. A move to minimum custody requires a psychological evaluation. Vol. III at 131. While Mr. Rapone indicated that he had caught up with his evaluations at Occoquan, Mr. Jones, with over 1,200 inmates, was struggling to give merely emergency service.

#### 2. Screening

None of the inmates coming into Occoquan has had a mental health diagnostic work-up. Plaintiffs' Ex. 16 at 29. Any initial screening that occurs is at the D.C. Jail and this is not done by mental health professionals. Vol. VI at 192.

Mr. Jones believes that there is a high probability that there are people in need of mental health services at Occoquan that no one knows about due to the lack of screening. Plaintiffs' Ex. 16 at 20.

#### 3. Q Block

In addition to housing inmates on administrative and punitive segregation, Q Block is used to house mentally ill inmates. Dr. Rundle believes that it is inappropriate and unacceptable from a professional viewpoint to house people with serious mental illnesses in a place like Q Block. They are locked in their cells for 23 hours a day with no social contact and they receive no treatment except for medication and an occasional visit from the psychologist. Vol. III at 143. While Mr. Jones tries to "walk through" Q Block daily, he might just call and talk to the officers there.

Mr. Jones has not participated in any type of in-service training for the officers on how to deal with mental health inmates in Q Block. Q Block is used for these purposes because there is nowhere else to

put them since the general population is housed in open dormitories. Plaintiffs' Ex. 16 at 12. While Mr. Jones tries to transfer inmates with mental health problems to the Central Detention Facility (CDF), they are often returned. He admits that there is a constant battle with CDF regarding these transfers at least once or twice a week. *Id.* at 34.

Dr. Rundle concludes that the inmates in Q Block "are abandoned to their hallucinations and their delusions ... it makes the illness more difficult to treat, in some cases may make it untreatable." Vol. III at 144, lines 1–4. Suicide risks are placed in Q Block and are checked every 30 minutes. Plaintiffs' Ex. 16 at 23. Dr. Rundle testified that a visual check every 30 minutes is ineffective since a person suffers brain damage and brain death somewhere in the range of five to eight minutes after deprivation of oxygen to the brain. Vol. III at 147, lines 1–5.

### D. *Personal Security*

Plaintiffs' expert in correctional administration, Mr. Eugene Miller, toured the facility in October 1986, September 1988, and December 1988. He was also qualified as an expert in the 1986 trial.

### 1. Classification

Classification of inmates is critical for prison security. Mr. Miller testified that diagnostic work-ups are supposed to occur at the Modular Facility before inmates arrive at Occoquan. Vol. IV at 82. Somewhere between 50 to 100 percent of the sentenced felons entering Occoquan have not had these diagnostic work-ups. *Id.* at 81–82.

Proper classification is essential for identifying violent inmates who may be dangerous to the general prison population and for identifying those in need of psychiatric care. This is important especially when the population at Occoquan has a significant history of substance use or abuse and significant mental health problems. Vol. VI at 12.

The failure of the correctional department to provide diagnostics has put undue pressure on the Classification and Parole staff to be involved at intake. This limits their ability to carry out their other duties, such as preparing parole progress reports, recalculating parole dates as a result of the Emergency Powers Act and dealing with individual inmate problems.

In order to keep up with the increased workload, C & P staff work about 100 to 150 hours of overtime a month. Vol. VI at 67. According to Chief Case Manager Walsh, he could use eight case managers. He has only six, plus one vacancy. The current ratio of case managers to inmates is 1 to 150. Vol. VI at 66–67.

### 2. *Correctional Staffing*

Mr. Douglas Stempson, the administrator of Occoquan, testified that as of October 24, 1988, Occoquan needed 100 additional correctional officers. Vol. VII at 109. As a result, many officers are logging extensive overtime hours. Consultants from the National Institute of Corrections are presently conducting a staffing study with the D.C. Department of Corrections' institutions to determine staffing needs. Plaintiffs' Ex. 2 at 9.

Due to the limited staffing, officers from other posts are consistently "pulled" to escort and supervise inmates during meals, to cover officers on breaks, or to cover construction supervision posts. This results in many dorms becoming dangerously understaffed. The staff assignment rosters are misleading because they indicate two, sometimes three, officers in each dormitory when, in reality, it is much less due to officers being "pulled."

### 3. Q Block

Due to the mixture of classifications, Q Block poses several problems. Q Block houses inmates on punitive segregation, newly arrived inmates, those in protective custody, and those with psychiatric problems. Combining this assortment with double-celling in cells, created for one occupant, causes multiple security problems.

One altercation occurred between two inmates housed in the same cell. Both were

in for protective custody. It appears that one inmate had been placed in this status due to being pressed for sexual favors in N Dorm. Plaintiffs' Ex. 23 at # 102. This is one example of why protective custody inmates should not be housed with any other inmates.

## II. Conclusions of Law

### A. *The Eighth Amendment Standard*

The standard to be used in determining whether conditions of confinement are cruel and unusual punishment under the eighth amendment was set out in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Conditions of confinement must not: (1) "involve the wanton and unnecessary infliction of pain"; or (2) "be grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* at 347, 101 S.Ct. at 2399. This standard is not static, for the eighth amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (quoted with approval in *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2398).

While "[e]ighth [a]mendment judgments should neither be nor appear to be merely the subjective views" of judges, *Rummel v. Estelle*, 445 U.S. 263, 275, 100 S.Ct. 1133, 1139–1140, 63 L.Ed.2d 382 (1980), a court's "own judgment will be brought to bear on the acceptability" of a certain condition. *Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 2868, 53 L.Ed.2d 982 (1977) (plurality opinion). These judgments, however, "should be informed by objective factors to the maximum possible extent." *Id.* at 592, 97 S.Ct. at 2866.

The recommendations of professional groups "may be helpful and relevant with respect to some questions, but 'they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question.' " *Rhodes*, 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13 (quoting *Bell v. Wolfish*, 441 U.S. 520, 543–44, n. 27, 99 S.Ct. 1861, 1876, n. 27, 60 L.Ed.2d 447 (1979)). Such opinions cannot

carry as much weight in determining contemporary standards of decency as "the public attitude toward a given sanction." *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion).

In *Rhodes*, inmates housed in the same cell in an Ohio maximum-security prison brought a class action alleging that "double celling" violated the eighth amendment. While the district court and the court of appeals found that double celling was cruel and unusual punishment, the Supreme Court found otherwise. The district court had made favorable findings of fact, describing the physical plant as "unquestionably a top-flight, first-class facility." *Chapman v. Rhodes*, 434 F.Supp. 1007, 1009 (S.D.Ohio 1977). Each cell had a heating and air circulation vent near the ceiling, hot and cold running water, cabinet, shelf, and a radio built into one of the walls. Over half of the cells had a window that opens and closes. The food was "adequate in every respect," and there was no evidence "that the food facilities were taxed by the prison population." *Id.* at 1014. The cells were free from offensive odor, the temperature was well controlled and the noise was not excessive. The library was "modern, well-lit" and "superior in quality and quantity." *Id.* at 1010.

In view of these findings, the Supreme Court found that they fell "far short in themselves of proving cruel and unusual punishment, for there is no evidence that double celling under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment." *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400. The Court noted that the Constitution does not mandate comfortable prisons and that a maximum-security facility "cannot be free of discomfort." *Id.* at 349, 101 S.Ct. at 2400.

### B. *The Eighth Amendment Violations*

■ The Court finds that many of the conditions at Occoquan fail to fulfill contemporary standards of decency. The Court of Appeals noted in its opinion that

the District had implemented a number of new procedures:

The prison had in place (1) new general housekeeping procedures to ensure sanitary conditions; (2) a routine fire inspection schedule; (3) new evacuation plans and training in implementing them; (4) sick call five days per week; and (5) new procedures for medical record transfers and follow-up medical care for inmates.

*Occoquan,* 844 F.2d at 840 n. 17. While this sounds all well and good, it can be seen from the findings at this time that these procedures, if implemented, have not worked. The housekeeping manual is not followed; the fire inspection is lacking; new evacuation plans have not been posted and proper training has not occurred; sick call has been increased to five days but has not cured other chronic problems; and the new procedures for medical records transfers and follow-up have either not been implemented or have failed to work.

This Court was criticized initially for relying too heavily on expert testimony. Unfortunately, the Court is not an expert in environmental or health hazards, fire safety or health care, and must rely, to a certain extent, on the reports made by the experts in these fields. This, in no way, relieves the Court of its burden of discerning and remedying constitutional violations. The professional standards do not establish the constitutional minima, but merely act as an aid in determining the minima. The Court has been careful to establish the contemporary standards of decency by assessing the public attitude toward the conditions at Occoquan. It is not an easy task.

1. Living Conditions

No human being should be required to frequent bathrooms with slime oozing down the walls, stalactites hanging from the ceiling, thick soap scum on the walls and floors, and sewer water dripping into toilets. While bathrooms in some dorms were worse than others,[11] most were substandard. Defendants would have the Court believe that the conditions of the bathrooms were due to the failure of the

inmates to apply "elbow grease." The Court is unconvinced. The evidence shows that neither proper cleaning supplies nor cleaning tools are provided. There is testimony that the maintenance workers can barely keep up with repairs, much less monitor the fixtures in the bathrooms. The ventilation in most of the bathrooms is nonexistent and pipes are leaking almost everywhere.

As stated in the facts, Dorms 5, 6 and 7 are particularly foul. These dorms were all hastily converted from warehouses in a matter of days and are not fit places in which to live. Defendants have informed the Court that they have plans to renovate these three dorms. *See* Defendants' Ex. 15. Notwithstanding this representation, the Court will monitor the renovation progress to ensure that it moves on schedule. The Court requests additional documentation that the asbestos located in these three dorms is removed before renovation begins.

The *Rhodes* Court recognized that prison conditions alone or in combination could be cruel and unusual when they "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. Sanitary living conditions and basic elements of hygiene are part of the "minimal civilized measure of life's necessities." An inmate must rely on prison authorities to provide him with sanitary conditions. Without cleaning supplies, proper plumbing maintenance and adequate bathroom facilities, inmates are without recourse. This Court determines that unsanitary living conditions that are as dilapidated and filthy as those at Occoquan cause "serious deprivation of basic human needs." *Id.*

These conditions go beyond merely restrictive or harsh and exceed the penalty that "criminal offenders pay for their offenses against society." *Id.* The conditions at Occoquan are light years away from those in *Rhodes.* Just one look at the photos of the toilets in Q Block is enough to illustrate this point.

---

11. K–1, K–2, L, N, 5, 6, and 7 Dorms were     particularly dilapidated and filthy.

Most of the dorms need serious maintenance. All missing screens and broken windows must be replaced. Vents in the bathrooms and sleeping areas must be cleaned and maintained periodically. The missing tiles in the shower of N Dorm must be replaced. All leaks in the pipes must be repaired, along with the defective plumbing fixtures and cracked urinals. Bulbs in the "Exit" signs must be replaced and maintained. Proper cleaning solutions, along with scrub brushes, must be provided. All exposed electrical wiring and fixtures must be covered or safely secured.

Defendants must submit a proposal to the Court within 60 days on how to remedy the nonexistent ventilation system in most of the dorms. With the excessive numbers of inmates living in these open dormitories, a satisfactory plan must be devised to operate in both cold and hot weather. The current "natural" ventilation does not work in the cold months when windows are closed and the fans are turned off.

Defendants must propose a quality assurance plan to monitor sanitation. Since it is evident that the present housekeeping manual is not followed, some "check" system must be devised to ensure that the manual is implemented.

■ The Court finds that the housing of "protective custody" inmates in Q Block violates the eighth amendment. To be housed with punitive segregation inmates is beyond the range of their punishment. Q Block is dank, dark, and filthy. While most of the toilets and fixtures need major overhauling, this alone will not cure the problem of housing those that should not be there in the first place. Defendants must submit a plan concerning alternative housing for protective custody inmates in Q Block within 60 days of this Court's order.

As for the fire safety hazards, the Court finds that these conditions endanger the lives of the inmates and violate the eighth amendment.

Prisoners have the right not to be subjected to the unreasonable threat of injury or death by fire and need not wait until actual casualties occur in order to obtain relief from such conditions.

*Hoptowit v. Spellman,* 753 F.2d 779, 784 (9th Cir.1985) (citation omitted). Defendants are directed to repair the inoperative fire alarms and smoke detectors, to post proper evacuation plans, and to correct all exits to provide that they swing outward instead of inward. The Court also directs defendants to propose a fire emergency plan for releasing inmates from their locked cells in Q Block.

2. Health Care

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" violates the eighth amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Such indifference may be shown by "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" or by showing "systemic or gross deficiencies in staffing, facilities, equipment or procedures." *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (citation omitted). The evidence points to systemic failures throughout the entire medical services that show deliberate indifference to the medical needs of the inmates in Occoquan.

Defendants have failed to develop a reliable screening system for inmates entering Occoquan as shown by the lack of testing for TB and syphilis. There is no follow-up system for treating chronic diseases and inmates wait months for appointments to specialty clinics. While defendants claim they have new procedures to monitor medical records, the evidence has shown that medical records are consistently lost, mislaid and fail to follow the inmate upon transfer. Medical staff has failed to maintain the medical records routinely by not entering current information or by not referring to the record when the inmate arrives at sick call. The procedures for sick call rely too heavily on MTA's by allowing them to diagnose and dispense medications without proper supervision by trained medical staff.

There are not enough physicians and PA's to cover the shifts and the numbers of inmates. Diabetics are not monitored properly, with incorrect doses of insulin given without reference to the medical files.

While the staffing might be adequate for the dental clinic, there are significant delays in receiving appointments and there is the constant problem of keeping track of the inmates' medical records.

The staffing in the mental health area is woefully short. The two psychologists there can barely keep up with emergencies, much less treat inmates for chronic problems. The psychiatric time is limited to two afternoons a week. As the chief psychologist indicated, Occoquan needs at least three more psychologists and clerical staff to handle reports and filing. At the present, they have no support staff whatsoever.

As with regular medical services, no proper screening takes place to determine mental health problems. A system must be developed upon entering Occoquan.

■ Inmates with mental health problems are no longer to be housed in Q Block. Defendants must develop a plan to house these inmates in a separate facility or allow them to be transferred to a mental hospital. Housing them in Q Block shows a deliberate indifference to their psychiatric health needs.

### 3. Other Conditions

■ Plaintiffs also ask the Court to examine the areas of food services, work release and other jobs, educational and drug programming, library facilities, and the general problem of idleness. While the Court is concerned with the lack of these services, it is not able to find that they violate the eighth amendment. As the *Rhodes* Court observed, "limited work hours and delay before receiving education do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind

simply are not punishments." *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400.

The Court recognizes the improvements to the kitchen area and can only hope that this trend will continue. The major danger posed to inmates is the temperatures of the foods, especially illustrated by the rice. The food, however, is nutritious and there is no evidence that the inmates are not receiving enough food. There are special diets provided for religious and health reasons. There was not enough evidence to show that inmates are actually becoming ill from improper food preparation or from the failure of the dishwasher to sanitize properly the eating utensils. Many of the problems occuring in the dining area are due to the number of people being served in a limited amount of space.

The remedies proposed by the Court to increase staffing and screening procedures should aid the inmates in obtaining access to educational programs and drug treatment. The library deficiencies do not come within the purview of the eighth amendment.

### B. *Population*

Plaintiffs seek a reduction of the population at Occoquan. While it is the opinion of the Court that overcrowding has caused the systemic problems occurring at Occoquan, it cannot, in good faith, order a population cap when such a remedy has been declared as overbroad by our Court of Appeals. The fact remains, however, that as long as more inmates are placed in Occoquan, the bathroom facilities will be overburdened, the dorms will be filled beyond capacity, the food will become cold due to extended feedings, appointments for medical care will be postponed as more and more inmates seek help, and sanitation will remain a problem while far too many inmates scuffle to use limited facilities.

Occoquan remains as one of the few medium-security facilities that is not subject to a court-imposed population cap.[12] As

---

**12.** The Modular Facility is the only exception. Although relatively new, it is already way over capacity. The remaining facilities are D.C. Jail (*Campbell v. McGruder,* C.A. No. 1462–71 and

C.A. No. 75–1668, 1987 WL 8724); Maximum Security (*John Doe v. District of Columbia,* C.A. No. 79–1726); Central Facility (*Twelve John Does v. District of Columbia,* C.A. No. 80–2136).

shown by the repeated findings of contempt for exceeding the population cap in the *Twelve John Does v. District of Columbia* case, Occoquan will remain the steam vent for the entire correctional system. This system is taxed to its fullest extent with no immediate solution in sight.[13]

### C. Remedy

■ In fashioning an appropriate remedy for the constitutional violations in this action, the Court is between Scylla and Charybdis. The Supreme Court has instructed courts that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Bell v. Wolfish*, 441 U.S. 520, 548, 99 S.Ct. 1861, 1878–1879, 60 L.Ed.2d 447 (1979). It is clear that courts are not to interfere with prison administration. On the other hand, our Court of Appeals instructs us that a population cap is "much too blunt an instrument." *Occoquan*, 844 F.2d at 842. Instead, it directs the Court to correct specifically each constitutional violation. While it appears to this Court that this comes painfully close to treading in the area of prison administration, the Court will do its utmost to correct the violations without being in the business of running prisons.

While " '[local] authorities have the *primary* responsibility for elucidating, assessing, and solving,' " *Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (*Milliken II*) (quoting *Brown v. Board of Educ.*, 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955)), if " '[local] authorities fail in their affirmative obligations ... judicial authority may be invoked.' " *Id.* (quoting *Swann v. Charlotte–Mecklenberg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971)). Our Court of Appeals has berated the District for its "apathetic" response to overcrowding on several occasions. *See, e.g., Twelve John Does v. District of Columbia*, 855 F.2d 874, 877 (D.C.

Cir.1988); *Twelve John Does*, 861 F.2d 295, 301 (D.C.Cir.1988).

The Court finds that defendants have failed to maintain affirmatively Occoquan in a proper manner as shown above, thereby violating plaintiffs' eighth amendment rights. The Court directs defendants to submit a written report on how they anticipate correcting these constitutional violations in the areas of sanitation, bathroom facilities, fire safety, health care, and staffing. These plans are to be submitted to the Court within 60 days of this opinion.

The Court is under the assumption that renovation of Dorms 5, 6, and 7 is underway. The Court directs defendants not to exceed the population level as of the date of this order while renovation is in progress. Since these dorms will be out of commission during renovation, the Court finds that the additional stress of housing these inmates, in conjunction with the existing constitutional violations, fails to satisfy contemporary standards of decency.

An appropriate order is attached.

### ORDER

Upon consideration of the trial held to the Court, the entire record herein, and for the reasons set forth in the accompanying opinion, it is by the Court this 30th day of June 1989,

ORDERED that judgment is entered in plaintiffs' favor; it is further

ORDERED that defendants shall submit a monthly progress report to the Court documenting the renovation of Dorms 5, 6, and 7. The first report shall be due on or before August 1, 1989; it is further

ORDERED that defendants shall certify to the Court that the asbestos in Dorms 5, 6, and 7 is removed before any further renovation occurs; it is further

ORDERED that defendants shall not exceed the population level as of June 30, 1989, while the renovation of these dorms is in progress; it is further

---

**13.** The construction of a new 800–bed Correctional Treatment Facility next to the D.C. Jail

was put on hold until just recently when the injunction against its construction was lifted.

ORDERED that defendants shall submit a written report to the Court within 60 days of this order on how they propose to correct the constitutional violations in the areas of sanitation, bathroom facilities, fire safety, health care, and staffing. These plans shall contain proposals on how to remedy the nonexistent ventilation system in the majority of the dorms; where to house "protective custody" inmates; where to house psychiatric inmates; how to release the inmates of Q Block during an emergency; and how to remedy the chronic understaffing problems throughout the facility; it is further

ORDERED that defendants shall endeavor to work with plaintiffs in order to submit proposals that are mutually agreeable; and it is further

ORDERED that this case is dismissed.